

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE  DEC 0 5 2019

~~Fauhurst~~ CC
CHIEF JUSTICE

This opinion was
filed for record
at 8 a.m. on Dec 5, 2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 95396-1 |
| Respondent, | |
| v. | EN BANC |
| SHELLY MARGARET ARNDT, | Filed  DEC 0 5 2019 |
| Petitioner. | |

STEPHENS, J.—After an extensive trial, a jury convicted Shelly Arndt on charges including aggravated first degree murder and first degree arson, and she received a sentence of life without the possibility of parole. Arndt appealed, arguing that her Sixth Amendment right to present a defense and her right to be free from double jeopardy were violated. U.S. CONST. amends. VI, V. The Court of Appeals affirmed Arndt's conviction and sentence in an unpublished, divided opinion.[1] *State*

---

[1] There are two Court of Appeals opinions involving this case. In September 2018, the Court of Appeals, Division Two, affirmed Arndt's conviction on the grounds that the trial court did not abuse its discretion by concluding that research conducted by a juror did not contribute to the verdict. *State v. Arndt*, 5 Wn. App. 2d 341, 351, 426 P.3d 804 (2018), *review denied*, 192 Wn.2d 1013 (2019).

*v. Arndt*, No. 48525-7-II, slip op. at 37 (Wash. Ct. App. Dec. 12, 2017) (unpublished), http://www. courts.wa.gov/opinions/pdf/D2%2048525-7-II%20 Unpublished%20Opinion.pdf.

We affirm. After a careful review of the record, we conclude that the trial court's rulings limiting the testimony of Arndt's expert witness did not violate Arndt's Sixth Amendment right to present a defense and were well within the court's discretion. We further conclude that Arndt's convictions for both first degree aggravated murder and first degree arson do not violate double jeopardy protections, as our precedent is clear that when two crimes have separate purposes and effects, multiple punishments are allowed.

## FACTS AND PROCEDURAL HISTORY

On February 23, 2014, a fire broke out in a two-story house that belonged to Kelly O'Neil and her husband. At the time of the fire, there were eight people inside the home: Kelly O'Neil, Shelly Arndt, Darcy Veeder Jr., Donald Thomas, O'Neil's adult daughter Autumn Kriefels, and three children. Everyone except Veeder was able to escape the fire. Veeder succumbed to smoke inhalation and died inside the residence.

The O'Neil home was heated by a wood stove on the main floor. Downstairs in the split-entry home there was a gas insert fireplace and baseboard heating, but

the power and gas to both were turned off. A vent between the upstairs and downstairs was located near the wood stove. On the night of the fire, Arndt, Veeder, and Thomas were the last occupants awake, and they fell asleep on couches in the upstairs living room. O'Neil, Kriefels, and the children were sleeping in various bedrooms.

Arndt testified that she woke to the smell of smoke and immediately woke Thomas up to tell him that she smelled something. She also woke O'Neil, who described a smell like burning tires and said she saw an orange glow coming from the living room side of the downstairs area. O'Neil collected the three minor children and ran outside. Upon realizing that Kriefels was still inside the home, O'Neil ran back with Arndt to get Kriefels from her room. The house was engulfed in flames within 30-45 seconds after they reached the driveway. Eventually, the fire department arrived to control the fire. Veeder's body was found in the living room on the second floor of the home.

After the fire department completed its work, the scene was turned over to Kitsap County Fire Marshal David Lynam for investigation. The details of Lynam's testimony, as well as the testimony of an insurance company investigator and two experts retained for trial, are a major focus in this appeal and are discussed below.

During the course of the investigation, suspicion fell on Arndt, who had prior arson charges.[2]

The State charged Arndt with several crimes. First, it charged her with aggravated first degree murder under RCW 9A.32.030(1)(a) and RCW 10.95.020 with the aggravating circumstance of first degree arson under RCW 10.95.020(11). It also made special allegations of domestic violence under RCW 10.99.020 and alleged an aggravating circumstance allowing for departure from the sentencing guidelines under RCW 9.94A.535(3)(b), alleging the victim was a particularly vulnerable person. Second, it alternatively charged her with first degree murder (felony murder) under RCW 9A.32.030(1)(c), again with special allegations of domestic violence and a particularly vulnerable person aggravating circumstance. Third, the State charged her with first degree arson under RCW 9A.48.020 with special allegations of domestic violence and a particularly vulnerable person aggravating circumstance. Finally, it charged her with six counts of second degree

---

[2] Specifically, Arndt had a criminal history involving violation of a no-contact order, malicious mischief, assault in the fourth degree, and two prior arson charges. The first arson allegation occurred in November 2011 and involved a fire in a home that Arndt shared with Veeder and his father, Darcy Veeder Sr. Investigation into this 2011 fire revealed that several pieces of clothing and blankets were placed on a TV and set on fire. For the second arson, which also occurred in November 2011, Arndt pleaded guilty to arson in the second degree. Arndt admitted that she intentionally set a box of towels on fire because she was tired of living with Darcy Veeder Sr. and wanted to move into her mother's house with Darcy Veeder Jr. For her arson in the second degree conviction, Arndt received a sentence of nine months.

assault under RCW 9A.36.021, two of which included special allegations of domestic violence.

*Fire Investigation Testimony*

The fire scene was analyzed by four investigators, including Fire Marshall Lynam. *See* Am. Pet. for Review at 2-5. Because this case is, in large part, concerned with the defense expert's adherence to proper investigatory procedures compared with the other investigations conducted, a brief overview of the individual investigators' work is necessary.

*Fire Marshal David Lynam*

Kitsap County Fire Marshal David Lynam is charged with investigating the origin, cause, and circumstances of fires within Kitsap County. 14 Verbatim Report of Proceedings (VRP) (Oct. 26, 2015) at 2594. As the prosecution's chief expert witness, Lynam testified to his qualifications and how he conducts all of his investigations in accordance with National Fire Protection Association 921 (NFPA 921).[3] *See id.* at 2586-99. In addition to following the guidance in NFPA 921, Lynam testified:

> The approach I have adopted and instructed all my deputies we adopt, is . . . [your work] typically goes from the outside in, you want to evaluate

---

[3] NAT'L FIRE PROT. ASS'N, NFPA 921: GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS. This document is referenced throughout the testimony of all investigators as the "standard" for fire investigation. A copy of this document does not appear to be provided in the record.

> the whole scene and condition that you have, and you are working from areas of least damage to most damage.

*Id.* at 2599. As the public official who takes charge of the fire scene immediately after the fire department, Lynam has the authority to exclude all private investigators until his investigation is complete. *Id.* at 2595.

Lynam's investigation and resulting conclusions were challenged extensively by the defendant's expert witness, Dale Mann. Because these conclusions are discussed in depth relating to various evidentiary rulings, they will not be detailed at this time. In summary, Lynam concluded that the fire started when someone ignited a beanbag chair near a couch in the house's basement. Am. Pet. for Review at 2; 15 VRP (Oct. 27, 2015) at 2922-23.

*Ed Iskra*

Ed Iskra was under contract with Allstate Insurance and was tasked with determining the origin and cause of the O'Neil residential fire to preserve the right of Allstate to proceed against any defective appliance manufacturer. 9 VRP (Oct. 15, 2015) at 1552. Based on the results of his investigation, Iskra testified for the prosecution.

On direct examination, Iskra described the procedures that he followed:

> I follow a systematic approach to my investigation. So I go out and do the exterior, the interior, and from the inspection, if there's specific things that may be—that might be a cost factor for the—besides my initial investigation,

for the insurance company, I call my claims adjustor and tell them what I
have and [w]ould you like me to do certain things; yes or no?

*Id.* at 1554. As a first step in his investigation, Iskra called Lynam to determine if

Lynam had released the scene. He also testified that he spoke with both of the

O'Neils to get a sense of the activities that occurred before and during the fire (e.g.,

what electrical devices were plugged in, etc.). Iskra testified how his standard

procedure is to conduct his own investigation independent of any prior conclusions.

Initially, because Lynam had not released the scene, Iskra conducted an

investigation of the exterior of the house, examined the locations where the fire

vented from the house, examined the resulting debris pile, and took photographs. He

detailed how his initial hypothesis, based on witness statements and exterior burn

patterns, led him to believe that the fire started on the outside deck. This hypothesis

was later disproved once he was able to gain access to the interior of the home a few

days later. *Id.* at 1560-61.

Iskra next detailed the systematic approach that he utilizes for examining the

interior of a fire scene:

I usually start from the front door, if that is accessible, sometimes it's not and
I've got to go in the back door, but I will go in—into the interior of the home
and go to what I determine the least area of damage and start my internal
examination of the home from there and work to the most damage.

*Id.* at 1569. Using this approach, Iskra described his examination of the interior of the house in detail. He discussed the possibility that the scene went to "flashover"[4] and reviewed the relevant training he had received to make a "flashover" determination. *Id.* at 1569-1631.

Finally, Iskra discussed his need to rely on the reports and documentation of other fire investigators because fire scenes are sometimes altered, e.g., from digging or the removal of electrical components, in the process of other investigations. Here, Iskra initially characterized the cause of the fire as "undetermined," due to "alterations of the scene and evidence being removed." *Id.* at 1633. After reviewing Fire Marshall Lynam's "documentation, data, [and] evidence," to supplement what he examined at the scene, Iskra changed his determination to "intentionally set." *Id.* at 1635. He examined Lynam's reports and documentation detailing how the fire was "dug out," and concluded that "[i]t was more likely than not that a fire was started with a handheld devi[c]e to combustible materials." *Id.* at 1636.

*Ken Rice*

Ken Rice is a senior fire investigator for CASE Forensics who conducted a technical review of Lynam's investigation. CASE Forensics is a privately held

---

[4] "Flashover is when a room is totally preheated from a fire burning within a room. Your heat layer lowers down, preheats all the furnishings within the room, and they basically auto ignite pretty much at the same time. . . . [Flashover] is when pretty much everything in the room instantaneously ignites." 8 VRP (Oct. 14, 2015) at 1502-03.

forensic engineering firm that conducts failure analysis in multiple disciplines of engineering. Rice testified for the prosecution concerning the requirements of NFPA 921 and the scientific method. The first portion of Rice's testimony focused on the conduct of fire investigations generally and the definition of different concepts related to the field.

Rice testified about the methodology he used to conduct his technical review, including examination of all reports and photographs furnished to him. 10 VRP (Oct. 19, 2015) at 1894. Specifically, Rice reviewed the reports of defense expert Mann and Fire Marshal Lynam. Rice discussed his review of the scene, via the photographs he had received, in detail. Upon conclusion of his initial review, Rice recommended that Lynam conduct additional testing due to his concern that an ember may have traveled out of the upstairs fireplace, down a floor vent, and ignited a combustible material on the lower level. Rice and Lynam performed these additional tests and concluded that it was not probable that an ember escaped the fireplace and caused the house fire.

Additionally, as part of his technical review, Rice performed testing "to see what smoke passage would look like in the upstairs room coming from the downstairs through the vent." 13 VRP (Oct. 22, 2015) at 2383-84. Based on the results of this testing, Rice was able to conclude, on a more probable than not basis,

that the fire did not occur directly below the vent. Rice also performed a furniture ignition test and concluded that "it was very probable that something was ignited on the left side of the sofa, caused the sofa to ignite, and caused the fire to spread from left to right." *Id.* at 2386, 2402.

Based on his technical review and testing, Rice concluded that the fire was incendiary in nature and that the area of origin was the "left side of the sofa near the floor level." *Id.* at 2406-27.

*Dale Mann*

Arndt retained Mann to review the fire investigation. Am. Pet. for Review at 4. Mann is a former state patrol crime lab supervisor and certified arson investigator. During his review, Mann examined all available materials, including Lynam's reports, photos and other documents, police reports, coroner's reports, and firefighter reports. Whether Mann adhered to acceptable investigation methods contained in NFPA 921 became the primary issue in determining the admissibility of his testimony.

Mann's testimony primarily challenged Lynam's determinations of the cause and origin of the fire. *Id.* at 5. Due to the nature of his investigation, the trial court limited Mann's testimony in a variety of ways, and he was unable to present his opinion that the fire should have been classified as "undetermined" rather than

"incendiary." *Id.* These evidentiary rulings form the basis of one of the central issues in this appeal. For this reason, like Lynam's conclusions, they are analyzed in greater detail below.

*Trial and Appeal*

After a three month trial, a jury found Arndt guilty of all crimes as charged by the State. Clerk's Papers (CP) at 430-32, 433-41, 472-73. The trial court sentenced Arndt to life without the possibility of parole per RCW 10.95.030(1). CP at 475.

The Court of Appeals affirmed Arndt's conviction and sentence. *Arndt*, slip op. at 37. The court found no error with respect to most of the trial court's limitations on Mann's testimony but held that the trial court wrongly excluded Mann's testimony about his review of the police reports. *Id.* at 1. However, it found this error harmless and held that Arndt was not denied her Sixth Amendment right to present a defense. *Id.* Acting Chief Judge Bradley Maxa dissented on this issue. *Id.* at 38. As for Arndt's challenge to her convictions for both aggravated first degree murder with a first degree arson aggravator and first degree arson, the Court of Appeals found no double jeopardy violation, concluding that the two crimes are not the same in fact or law. *Id.* at 1. After deferring consideration of Arndt's petition for review for almost a year, pending *State v. Allen*, 192 Wn.2d 526, 431 P.3d 117 (2018), this court granted review. *State v. Arndt*, 193 Wn.2d 1001 (2019).

## ANALYSIS

A. The Trial Court Acted within Its Discretion and Did Not Violate Arndt's Sixth Amendment Right To Present a Defense by Limiting Her Expert Witness's Testimony

Arndt argues that the trial court violated her constitutional right to present a defense. Whether a Sixth Amendment right has been abridged presents a legal question that is reviewed de novo. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). However, the trial court's evidentiary rulings under ER 702 remain subject to abuse of discretion review. *State v. Yates*, 161 Wn.2d 714, 762, 168 P.3d 359 (2007).

While Arndt asks this court to "unequivocally hold that violations of the right to present a defense are reviewed *de novo*, with no deference to the trial court's decision to exclude evidence," Am. Pet. for Review at 10, we recently adhered to a two-step standard of review in *State v. Clark*, 187 Wn.2d 641, 648-56, 389 P.3d 462 (2017) (abuse of discretion review of evidentiary rulings and de novo review of whether such rulings violated the defendant's right to present a defense). Here, as in *Clark*, we apply this two-step review process to review the trial court's individual evidentiary rulings for an abuse of discretion and to consider de novo the constitutional question of whether these rulings deprived Arndt of her Sixth Amendment right to present a defense.

*Review of Evidentiary Rulings for Abuse of Discretion*

In Washington, expert testimony must satisfy both the *Frye*[5] test and ER 702.[6]

*State v. Copeland*, 130 Wn.2d 244, 256, 922 P.2d 1304 (1996). While *Frye* concerns

the use of *novel* scientific methodology and guards against the admission of new

techniques until a "scientific consensus decides the methodology is reliable," *Lakey*

*v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918-19, 296 P.3d 860 (2013), ER 702

concerns the use of *existing* scientific methodology and excludes testimony "where

the expert fails to adhere to that reliable methodology." *Id.* Admissibility decisions

under ER 702 are reviewed for abuse of discretion. *Yates*, 161 Wn.2d at 762.

Arndt takes issue with the limitations the trial judge placed on Mann's

testimony due to the fact that he had not personally conducted a complete origin and

cause investigation of the scene. Am. Pet. for Review at 5. In placing these

limitations on Mann's testimony, the judge clearly stated that her rationale was based

on Mann's failure to follow *well established* scientific methodology:

> THE COURT: It is not a problem that he goes to the scene, as [the]
> defense argues, but it is a problem when he starts to test. . . .
>
> . . . .

[5] *Frye v. United States*, 54 U.S. App. D.C. 46, 293 F. 1013 (1923).
[6] ER 702, Testimony By Experts:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

If he were to do an origin and cause, he would need to follow the scientific method and eliminate various hypotheses.
Instead by focusing on one area, which seems to be this foosball area, he's taking one hypothesis and testing it. And not eliminating, under the scientific method, the entire scene.

19 VRP (Nov. 12, 2015) at 3650-51. None of the limitations placed on Mann's testimony concerned the use of a novel scientific method with dubious credibility. Instead, all objections to the exclusion of expert testimony centered on whether the expert properly adhered to existing acceptable methodology. Such decisions fall under ER 702 and are properly reviewed for abuse of discretion. *Yates*, 161 Wn.2d at 762; *Clark*, 187 Wn.2d at 648.

Expert testimony is admitted under ER 702 when the trial court determines (1) that the witness qualifies as an expert and (2) that the testimony will assist the trier of fact. *In re Det. of McGary*, 175 Wn. App. 328, 338-39, 306 P.3d 1005 (2013). Trial courts are given a large degree of freedom when making these determinations, subject to reversal only for a clear abuse of discretion. *Yates*, 161 Wn.2d at 762. "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). Specifically, an abuse of discretion can be found when the trial court "relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." *Id.* at 284. Because unreliable testimony does not assist

the trier of fact, it is properly excluded under ER 702. *Lackey*, 176 Wn.2d at 918. In our review for abuse of discretion, we may affirm the trial court on any basis that the record supports, including any theories "established by the pleadings and supported by the proof," even if these theories were not originally considered by the trial court. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

Due to the highly fact-specific nature of the analysis required to determine if the trial court abused its discretion, what follows is an individual discussion on each category of exclusions/restrictions placed on Mann's testimony. After reviewing these exclusions individually, it becomes clear that the trial judge took issue with the *method* Mann used to analyze the particular issues, not the fact that he selected particular issues to investigate. On multiple occasions, the judge and counsel had extensive discussions about Mann's adherence to accepted procedures and resulting admissibility concerns. Because all of the trial judge's exclusion decisions were supported by tenable reasons and based on correct statements of the law, we hold that the trial court did not abuse its discretion in limiting the scope of Mann's testimony.

1. Opening the Door

Arndt argues that the trial court erred when it "excluded Mann's opinion that the fire should be classified as undetermined (rather than incendiary)." Am. Pet. for

Review at 6. Initially, Arndt argued that the State "opened the door" to Mann's testimony challenging Lynam's conclusions about the fire's origin and cause:

> MR. LaCROSS: They had witnesses testify that—expert witnesses that Mr. Lynam did this investigation perfectly. It was a good investigation. They opened the door for whether or not this investigation was done properly. And that's what Mr. Mann is here to testify, that it wasn't done properly.

18 VRP (Nov. 10, 2015) at 3411-12. The trial court dialogue then centered around whether Mann conducted a proper origin and cause investigation in accordance with the scientific method or whether he simply reviewed Lynam's investigation. *See id.* at 3411-13, 3524-38. The State objected to Mann's testimony regarding the origin of the fire:

> So we would object—if what he did was simply a review in this case, we would object to any—and didn't do an origin and cause determination, we would object to any picture that he took, any testimony about layering, any testimony about any of the scene investigations that he did. And we'd ask that he be allowed only to testify about his review of Fire Marshal Lynam's work.

*Id.* at 3525. In response to this objection, the trial court attempted to determine the exact nature of Mann's testimony:

> THE COURT: If he's going to say where the fire started, does he not have to present a methodology for how and where it started?
> MR. LaCROSS: As he has—he used the scientific method to determine where the origin was, yes, the area.
> THE COURT: So he went through a whole analysis of hypotheses and eliminated them one at a time, and is that written up in the report?
> MR. LaCROSS: No.
> THE COURT: That is the scientific method, is it not?

-16-

> MR. LaCROSS: Not for what he did. He did an evaluation, a critique of what the Fire Marshal did. . . . It doesn't mean that he did an origin and cause investigation. . . .
>
> . . . .
>
> THE COURT: My worry, Mr. LaCross, is that, as we've been arguing this much of this day, you have repeatedly told me this is not an origin and cause.
>
> MR. LaCROSS: I still say that. It is not an origin and cause determination.
>
> THE COURT: But he's effectively eliminating and deciding whether or not what the origin and cause was.
>
> If he's saying it is in a certain area of the house, and if he's going through and effectively double testing what's already been done by the Fire Marshal, isn't he effectively—isn't he effectively trying to establish the origin and cause?
>
> MR. LaCROSS: No, he is not.
>
> THE COURT: What is he doing then?
>
> MR. LaCROSS: He is evaluating, again, the evaluation of the origin and cause investigation of the fire marshal.

*Id.* at 3532, 3536-37. In the end, based on the above discussion, the trial court issued the following ruling:

> THE COURT: So I'm going to allow the testimony from Dale Mann, provided that there is no conclusion presented by Dale Mann as to what the origin and cause would have been. He can go into the process. He can go into what he observed. I'm not sure there's any authority to say he can't go to the scene, provided he's not giving any conclusions as to the cause.

*Id.* at 3538.

As the Court of Appeals recognized, Arndt acknowledged that Mann did not conduct a full origin and cause investigation similar to Lynam, Iskra and Rice. *Arndt*, slip op. at 11. Further, there was no dispute at trial that fire causation must be determined using the NFPA 921 origin and cause methodology. When the relevance

-17-

and helpfulness of expert testimony is debatable, there is no abuse of discretion in excluding the testimony on tenable grounds. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). As the above discussions clearly evidence, the trial judge went to some effort to determine the nature of Mann's investigation. Instead of excluding Mann's testimony entirely, the trial judge placed specific limitations on his testimony that were directly related to the limited nature of his investigation. Because the judge's rulings were based on tenable grounds and relied on supported facts, there was no abuse of discretion.

2. Melted Bucket by the Couch

Arndt argues that the trial court erred when it excluded Mann's testimony about the remains of a plastic bucket found near the proposed point of the fire's origin. Pet'r's Suppl. Br. at 7. Because the bucket was made of a material that had lower melting and boiling points than the fill material for the beanbag chair, Arndt contends that the presence of the melted bucket disproved Lynam's hypothesized ignition sequence and showed the overall inadequacy of Lynam's investigation. *Id.* at 3.

At trial, the State argued that Mann's manipulation of the bucket from the fire scene constituted an investigation and was therefore problematic because Mann did not follow established origin and cause protocols. 19 VRP (Nov. 12, 2015) at 3658-

67. In response, there was another lengthy discussion between the parties and the court regarding the bounds of an origin and cause investigation. *Id.* Ultimately, both sides were given the opportunity to make arguments specific to the bucket itself:

> THE COURT: But there's still an issue of the bucket.
> MR. LaCROSS: The bucket—again, he is there—
> THE COURT: How is he not there with the foosball table and taking the remnants there and having it tested? How is the bucket any different from that?
> MR. LaCROSS: Well, I guess, I'm—I'm trying to articulate it. . . . Is he supposed to ignore it?
> Should he have turned around and walked away, and said, you know, I can see something [there] that's really, really important but I'd better not look at, because then if I do, you know, my opinions and I've all of a sudden turned into this person that's unreliable and none of my opinions about the entire investigation will have any validity. If I happen to look at this very obvious evidence, should I walk away?
> MS. MONTGOMERY [the State]: I have an answer to that. No.
> But what he should do is also pick up the other obvious pieces of information: ceiling fan, pedestal fan, baseboard heaters. Do his own testing on those. You don't get to selectively . . . pick out one thing that works for you and ignore the things that don't. You don't get to do it. And that's exactly what Dale Mann did here because it supports his conclusions.

*Id.* at 3665-66. Once again, the court ruled to allow the testimony with express limitations:

> THE COURT: I tend to agree with that. He can testify that he saw a bucket, but he doesn't get to test it. And the testing would be lifting the bucket and detailing his observations.

*Id.* at 3666-67.

ER 702 expressly allows for the exclusion of expert testimony when an expert fails to adhere to reliable methodology. *McGary*, 175 Wn. App. at 339. The

conclusion that Mann conducted selective testing and did not follow the procedures specified by NFPA 921 and the scientific method is well supported by the record, as evidenced in the excerpts above. The trial judge gave Arndt ample opportunities to defend the procedures used in Mann's investigation and specifically heard argumentation about the manipulation of the bucket itself. Because the limitations placed on Mann's testimony regarding the bucket relied on supported facts and were not "manifestly unreasonable," there was no abuse of discretion. *See, e.g., Lord*, 161 Wn.2d at 283-84.

3. Plastic Container

Arndt argues that the trial court erred when it excluded Mann's opinion that the area around the basement hearth had not been properly examined and prevented Mann from explaining the significance of a second "melted plastic remnant" that he had discovered adhered to the floor. Pet'r's Suppl. Br. at 8. We disagree. The record clearly supports the fact that Mann was able to testify to photographs taken of the basement hearth and explain their significance:

> [MR. MANN:] The second thing of interest here is that the fireplace hearth here is—still has quite a bit of debris on it. And the Fire Marshal said that that was layered down to clean, but it's obvious that it was not.
> [MR. LaCROSS]: And so what's significant about it not being layered down?
> [MR. MANN:] If you don't layer that down to the ceramics, you have no idea what was actually present on that ceramic hearth prior to the fire.
> . . . .

And you would never have a chance to see evidence of those if you don't layer all the way down to that ceramic hearth. And that process was not done by the Kitsap County Fire Marshal.

20 VRP (Nov. 16, 2015) at 3859. Additionally, Mann was able to testify that he found remnants of a plastic container by the hearth and about the significance of the fact that the bottom side of the plastic was in pristine condition. *Arndt*, slip op. at 13. For these reasons, Arndt fails to show an abuse of discretion by the trial court on this issue.

4. Polystyrene Test Results

Arndt argues that the trial court erred by excluding Mann's "lab test results showing the presence of polystyrene around the foosball table and the absence of polystyrene at the hypothesized point of origin." Pet'r's Suppl. Br. at 8. The court and the parties engaged in a lengthy discussion about the procedures for polystyrene testing and the relationship of polystyrenes to the origin and cause of the fire. 18 VRP (Nov. 10, 2015) at 3564-79. As the record makes clear, Arndt was given multiple opportunities to demonstrate the admissibility of the polystyrene test results:

> THE COURT: I'm persuaded by the State's argument on this issue.
> Certainly, it may be that—that he tested for polystyrenes there, but it is not relevant unless it can be connected. And there's not been a sufficient connection to a bean bag chair.
> We know that the testimony has been that styrenes or polystyrenes are abundant.
> MR. LaCROSS: Can I have my fourth or fifth bite at this apple?

-21-

> THE COURT: No. Well, okay. Go ahead.
>
> MR. LaCROSS: It is absolutely critical to show that they did not follow the scientific procedure. Did not investigate other potential causes and origin.
>
> And this shows—it clearly shows that they did not layer over here. When it was layered over here, lo[] and behold there is polystyrene that is found.
>
> THE COURT: What does that mean?
>
> . . . .
>
> THE COURT: What is your witness going to say that polystyrene means?
>
> Is he just going to say it is polystyrene, or is he going to say it was polystyrene that came from the bean bag chair?
>
> MR. LaCROSS: He will say it is a polystyrene. He's not going to say that it came from a bean bag chair.

*Id.* at 3573-75. In addition to a lack of relevance due to Mann's inability to connect the polystyrene to the beanbag chair, the court also excluded Mann's polystyrene testing due to Mann's failure to comply with the scientific method.

> THE COURT: And if I were to allow him to testify to the polystyrene testing, that effectively allows this witness to go through a fire scene and pick out areas that he believes are important for purposes of this litigation to advance or diminish certain aspects of the scene.

19 VRP (Nov. 12, 2015) at 3650-51. Because the trial judge clearly articulated her rationale, relied on supported facts, and took a reasonable view under the governing standards, there was no abuse of discretion. *See, e.g., Lord*, 161 Wn.2d at 283-84. The judge made clear that Mann's polystyrene testing was excluded because it was not relevant and not reliable. Both of these exclusions are justified under ER 702.

5. Flashover

Arndt argues that the trial court erred when it excluded Mann's opinion that the room went to "flashover" because this fact had the potential to skew the fire marshal's investigation. Pet'r's Suppl. Br. at 8. In accordance with the court's previous evidentiary rulings, Mann was able to testify to errors in the investigation and the potential impacts of a "flashover":

> [MR. MANN:] It was apparent that fairly early in their investigation they zeroed in on what they call "lowest area of burn" as the origin of the fire.
> And really, in my opinion, didn't recognize the fact that the room didn't go to flashover. And the lowest area of burn, particularly in the case of flashover, may not be the origin of the fire.
> When a room gets to—goes into flashover, you need to be careful and investigate the entire room.

20 VRP (Nov. 16, 2015) at 3814. As the Court of Appeals recognized and quoted in its opinion, Mann was also able to testify to the fact that signs of "flashover" were present at the scene. *Arndt*, slip op. at 16; 20 VRP (Nov. 16, 2015) at 3827-28. Finally, Mann was able to offer the following testimony on direct examination:

> [MR. LaCROSS:] So from your review of the Kitsap County Fire Marshal's investigations, were there any indicators, as to whether or not flashover occurs when you look at a fire scene, missing?
> [MR. MANN:] I believe that that fire scene had practically every post-fire indicator for flashover. And it had many indicators in the sequence, if you look at the timeline of flashover.
> So, yes, it had many—there's nothing at all inconsistent with anything about that fire to indicate that it did not go to flashover.

20 VRP (Nov. 16, 2015) at 3894. A plain reading of the record shows that Arndt was able to put forth testimony regarding the effect of a "flashover" on the

investigation and the potential for a "flashover" to have occurred in this case. While this testimony was subject to some limitations, these limitations were well within the trial court's discretion, and Mann was allowed to offer testimony supporting a theory of "flashover."

## 6. Review of Reports

Arndt argues that the trial court erred by excluding Mann's conclusions drawn from his review of police, fire department, and coroner reports. Pet'r's Suppl. Br. at 8. An examination of the record shows that the court properly considered the expert's adherence to approved methodology under ER 702:

> THE COURT: Where in the scientific literature does it say that a fire marshal needs to go through the police reports and verify every statement and essentially track a police investigation?
> I suppose that's really what it comes down to when we get to this sort of thing.
> Is the Fire Marshal expected to follow a coroner's report or to follow a police report to consistently cross-check facts?
> Is that in the fire literature under 921 saying that that is the scientific method?
> MR. LaCROSS: There is nothing—there is nothing in the NFPA 921 that says you have to go and verify with—check with the investigating sheriff's department or anything like that.
> THE COURT: If that's the case, does that not then supplant this witness's opinion, not necessarily expert, what he might think should be done compared to somebody else? Does that qualify as an expert opinion?
> MR. LaCROSS: Yes, it is still—it is—it is information that is available, that is whether—whether or not, you know, this person actually, for example, smoked. It shows—the information that Fire Marshal took has to be validated. Now it doesn't say how you have to validate it . . . .
> . . . .

MS. MONTGOMERY [the State]: He has no basis under 921 or the peer review or anything. He has shown no authority for him to testify to any of this as an expert.

THE COURT: And certainly that is evidence that has come in through other witnesses. We've had testimony as to, you know, what was asked of various people. And I don't know it requires expert testimony to get there.

. . . .

THE COURT: All right. Well, I stand by my previous ruling.

MR. LaCROSS: Which was?

THE COURT: That this witness will not get into his review of the particular police reports and the coroner's report.

19 VRP (Nov. 12, 2015) at 3758-60. As evidenced by the record, the court clearly understood the issue and applied the correct legal standard under ER 702. Because Mann's expert testimony regarding review of applicable police, fire department, and coroner reports did not accord with accepted methodology, the court did not abuse its discretion when it excluded this testimony.[7]

7.   Demonstrative Exhibit

Arndt argues that the trial court erred when it excluded photographic evidence demonstrating how burning liquids pool and create protected areas during a fire.

---

[7] Of note, the Court of Appeals did find an abuse of discretion in this instance and agreed with Arndt that the trial court erroneously "excluded Mann's opinions drawn from his review of police reports and coroner's reports as a part of his evaluation of Lynam's investigation." *Arndt*, slip op. at 25. Nonetheless, the Court of Appeals found this error to be harmless and concluded there was no violation of Arndt's right to present a defense. *Id.* at 25-27. Because trial courts are given a large degree of freedom when making these evidentiary determinations and are subject to reversal only for a clear abuse of discretion, *Yates*, 161 Wn.2d at 762, we find that no abuse of discretion occurred. Nonetheless, we agree with the Court of Appeals that even if Mann's testimony about the reports should have been allowed, the exclusion is harmless because "the discrepancies were apparent to the jury" through other expert testimony. *Arndt*, slip op. at 25-27.

Pet'r's Suppl. Br. at 8. Despite the fact that the use of demonstrative or illustrative evidence is favored, the trial court is given wide discretion in determining whether to admit demonstrative evidence. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 426, 114 P.3d 607 (2005). In order to be admissible, demonstrative evidence must utilize experimental conditions that are substantially similar to the facts of the case at hand. *State v. Hultenschmidt*, 125 Wn. App. 259, 268, 102 P.3d 192 (2004). Ultimately, the test for admissibility of an experiment as evidence is "'whether it tends to enlighten the jury and to enable them more intelligently to consider the issues presented.'" *Jenkins v. Snohomish County Pub. Util. Dist. No. 1*, 105 Wn.2d 99, 107, 713 P.2d 79 (1986) (quoting *Sewell v. MacRae*, 52 Wn.2d 103, 107, 323 P.2d 236 (1958)).

In making an admissibility determination regarding Mann's photographs demonstrating the burn patterns of pooling liquids, the court had significant concerns about the similarity:

> THE COURT: So I'm not sure I'm understanding what an ignitable liquid has to do with this case.
> I understand your witness may have wanted to set a fire, but just from your very words right now, you are saying this is what happens when you put ignitable liquid from that picture and what remains. I don't see how that has a bearing on this case.
> If your witness wants to testify to the protected area, the subflooring of a protected area, and what it looks like after burning, that can be testimony. And if he's got some evidence to show what it looks like, just generally speaking as somebody in his field, that's perfectly fine too. This is what I'm

saying. This is what he did. He took ignitable liquid and lit it on fire and wants to show it. I don't see the relevancy.

. . . .

THE COURT: Well, he can testify to protected areas and what they looked like generally based on his training and experience.

But to present what I think can only be described as a test of taking an accelerant and somehow pouring it in a circle to leave a certain pattern, I'm not seeing the bearing on that.

Now, he can testify to his observations based upon his experience and training as to what a protected area would look like; that would be fine. That's allowed.

20 VRP (Nov. 16, 2015) at 3971-73. On multiple occasions, the trial court expressed concern with the dissimilarity of the demonstrative evidence, in addition to other relevancy concerns. *See id.* at 3965-4005. Instead of excluding the evidence wholesale, the trial court provided ample opportunities to present the same testimony in another medium. *Id.* at 3971-73. Ultimately, because Mann's photographs involved experimental conditions that were not sufficiently similar to the case at hand, primarily due to the presence of an ignitable liquid, the trial court acted within its discretion to exclude the exhibits.

8.  Smoke Visibility

Lastly, Arndt argues that the trial court erred when it "prevented Mann from critiquing Lynam's conclusion that smoke would have been immediately visible in the living room had an accidental fire started in the basement directly below the fireplace insert." Pet'r's Suppl. Br. at 8. The Court of Appeals found this argument

to be "factually meritless as Mann testified on the subject and presented the information that he gathered." *Arndt*, slip op. at 29.

Mann was allowed to testify at length regarding his efforts to evaluate Lynam's conclusion that there was no visible smoke:

> [MR. MANN:] Well, to me, when I started looking at the whole discussion about how an apparent smoke would be upstairs, we had a very quickly building fire downstairs and an open stairway. It seems obvious to me that there is smoke upstairs in any case.
>
> Because shortly after that, Donny was awoken, he went down to the foyer, and saw smoke coming up as well as flames. That would be highly unusual not to be able to smell smoke 30 to 60 seconds prior to that.
>
> So to me, the question of: Was there noticeable smoke upstairs? Is kind of a non-sequitur. The whole discussion didn't make a lot of sense to me.
>
> But what I began to do was just look at the hypothesis that Donny should have noticed smoke when he walked by the vents by the fireplace in the living room. And that's kind of what I'm evaluating at this point. Just given the fact that maybe there wasn't smoke already coming up the staircase and shouldn't Donny have seen smoke coming through the vents.

20 VRP (Nov. 16, 2015) at 3897-98. In addition, Mann was also able to detail his efforts to determine how much light was present on the night in question and why these facts would matter in an investigation:

> [MR. MANN:] I was gathering data to evaluate the hypothesis that there was sufficient light to see smoke. So this was just a question of how much light could there be in that house. Even though I don't have a specific answer at this point, I'm illustrating some of the things one would need to consider to answer that question.

*Id.* at 3899. When the State objected to this testimony, the judge refused to strike it from the record. *Id.* at 3902. Given the testimony allowed, Arndt fails to state any

grounds to find an abuse of discretion, and the Court of Appeals correctly concluded that this claim was factually meritless.

Having carefully reviewed the trial record, we conclude that the trial court exercised appropriate discretion in making the above-described admissibility determinations. We are mindful that "[t]he trial court has a gatekeeping function under the rules of evidence." *State v. Ellis*, 136 Wn.2d 498, 540, 963 P.2d 843 (1998). This necessarily entails making judgment calls as to what the jury may hear. *Id.* at 541 (noting judges "must not abdicate our gatekeeping role by receding from difficult decisions and letting the jury decide how much weight to give to evidence that is in fact irrelevant"). Because the trial court's decisions were based on tenable grounds, and the rationale was clearly stated in the record, the evidence rulings did not constitute an abuse of discretion.

### *Sixth Amendment Right To Present a Defense*

Because a defendant's constitutional right to present a defense is not absolute, *see, e.g., Jones*, 168 Wn.2d at 720, the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted. *Id.* In some instances regarding evidence of high probative value, "it appears no state interest can be compelling enough to preclude its introduction consistent with

the Sixth Amendment and Const. art. 1 § 22." *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983).

As an example, in *Jones*, the trial court interpreted a rape shield law to preclude the defendant from presenting any evidence that the victim had voluntarily engaged in an "all-night, drug-induced sex party." *Jones*, 168 Wn.2d at 721. This court reversed, noting that this testimony was "evidence of extremely high probative value; it is Jones's entire defense." *Id.* While we held that the rape shield statute was inapplicable as a matter of law, we also observed that even if the statute did apply, the fact that the "sex party evidence" was Jones's entire defense meant that the statute could not be invoked to bar the admission of such evidence without violating the Sixth Amendment.[8] *Id.* at 723-24.

Unlike in *Jones*, Arndt's proffered evidence was not excluded entirely and Mann was able to testify at length for the defense, disputing Lynam's conclusions and proposing an alternative ignition sequence. *See* 19 VRP (Nov. 12, 2015) at 3573-3794; 20 VRP (Nov. 16, 2015) at 3797-4036; 21 VRP (Nov. 17, 2015) at 4040-

---

[8] Even though *Jones* was resolved using a statutory interpretation analysis, this court still weighed the State's interest in exclusion versus the probative value of the evidence to the defendant. *See Jones*, 168 Wn. 2d at 721. Because the evidence that Jones sought to admit was of "extremely high probative value, . . . no State interest can possibly be compelling enough to preclude [its] introduction" and "the trial court violated the Sixth Amendment when it barred such evidence." *Id.*

4162. For example, Mann was able to articulate the fact that origin and cause were incredibly difficult to determine when a room went to "flashover":

> And they found that somewhat less than six percent of the people could correctly identify even the quadrants of the fire in these one-room burn cells. And these burn cells would have [a] trash can, a bureau, a bed, they would be carpeted. Very simple furnishings.
> But because of the effects of these extremely high heat fluxes that occur at flashover, it really begins to disguise fire patterns.

19 VRP (Nov. 12, 2015) at 3706. Mann followed this discussion by testifying that "flashover" likely occurred in this case:

> This is significant because it shows the main part of the floor, most of the floor in the family room/rec room following the Kitsap County investigation. . . . All this kind—these patterns here are all concrete that chipped up. It means it got very hot. . . . It said we had a tremendous amount of energy or a broad area that was radiating down to the floor. We know that doesn't burn as well as newspaper, so we know we had more than 20 kilowatts per square meter of energy, and that is a classic definition of flashover.

20 VRP (Nov. 16, 2015) at 3827-28. This testimony illustrates how, despite the limitations placed on Mann's testimony by the court's evidentiary rulings, Arndt was able to present relevant evidence supporting her central defense theory: that the fire marshal's investigation was fundamentally flawed and that the proposed origin and ignition sequence was incorrect.

Unlike in *Jones*, where the court was concerned that application of a rape shield statute eliminated the defendant's *entire* defense, *Jones*, 168 Wn.2d at 724, Arndt was able to advance her defense theory, including through Mann's testimony

rebutting the State's expert's conclusions. In this regard, the case is more similar to *Clark*, which also involved limitations on expert testimony (on the basis of relevancy rather than ER 702), but the defendant remained able to offer evidence to support his defense theories. 187 Wn.2d at 653-54. We conclude that Arndt suffered no violation of her Sixth Amendment right to present a defense.

In sum, applying *Clark*'s two part standard of review, we hold that the trial court did not abuse its discretion in limiting Mann's testimony but properly exercised its gatekeeping function and correctly applied ER 702. Despite placing significant limitations on the expert testimony of Mann, the trial court did not deprive Arndt of her Sixth Amendment right to present a defense. We affirm the Court of Appeals on this issue.

B. Arndt's Right To Be Free from Double Jeopardy Was Not Violated When the Trial Court Entered Convictions for Both Aggravated First Degree Murder with a First Degree Arson Aggravator and First Degree Arson

When the Court of Appeals considered Arndt's double jeopardy claims, it did so prior to our decision in *Allen*. *Arndt*, slip op. at 34-36. The Court of Appeals drew a distinction between the elements of the crimes at issue and aggravating circumstances, and concluded that the two crimes were not the "same in law." *Arndt*, slip op. at 36. We affirm Arndt's convictions on a different rationale. Because the two convictions at issue have independent purposes and effects, we find that the

-32-

legislature clearly intended to allow the imposition of multiple punishments in this instance.

Claims of double jeopardy present questions of law, and our review is de novo. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). Because the legislature has the power to define criminal conduct and assign punishment, the first step in determining whether a defendant has suffered multiple punishments for the same offense is to determine what punishments the legislature has authorized. *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). In order to qualify as the "same offense" for double jeopardy purposes, the two offenses must be the same both in law and in fact. *Id.* at 777. Multiple punishments may implicate double jeopardy concerns, regardless of whether the sentences received are served concurrently. *Id.* at 773.

In this case, the dispositive question is whether the legislature intended to impose separate punishments for first degree murder aggravated by the commission of first degree arson and first degree arson itself. *See State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005). "If the legislature authorized cumulative punishments for both crimes, then double jeopardy is not offended." *Id.* We follow four analytical steps to determine legislative intent regarding whether cumulative punishment is authorized: (1) consideration of any express or implicit legislative

-33-

intent, (2) application of the *Blockburger*,[9] or "same evidence," test, (3) application of the "merger doctrine," and (4) consideration of any independent purpose or effect that would allow punishment as a separate offense. *Id*. at 771-73.

"If there is clear legislative intent to impose multiple punishments for the same act or conduct, this is the end of the inquiry and no double jeopardy violation exists." *State v. Kelley*, 168 Wn.2d 72, 77, 226 P.3d 773 (2010). Legislative intent may be express, *see* RCW 9A.52.050,[10] or implied. *Freeman*, 153 Wn.2d at 771-72. Neither RCW 10.95.020 (definition of Capital punishment—Aggravated first degree murder) nor RCW 9A.48.020 (Arson in the first degree) contains any express language allowing multiple punishments. The State argues that legislative intent for separate punishment is nonetheless clearly evidenced. It relies on legislative inaction in the face of cases dating back to 1995 "that hold that separate punishment of substantive offenses was proper even when they were also aggravating circumstances under RCW 10.95.020." Suppl. Br. of Resp't at 5. Generally, the legislature's failure to amend a statute after judicial construction of such statute signals legislative agreement with the construction. *See State v. Edwards*, 84 Wn.

---

[9] *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[10] *See, e.g.*, RCW 9A.52.050 ("Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately.").

App. 5, 12-13, 924 P.2d 397 (1996). We have previously construed the use of RCW 10.95.020's aggravators as intending cumulative punishments, not constituting a violation of double jeopardy, *see State v. Brett*, 126 Wn.2d 136, 181, 892 P.2d 29 (1995) (holding no violation of double jeopardy when defendant was charged with aggravated first degree murder and first degree felony murder), and the legislature has never amended the statute in response to our precedent.

The question is whether we must reconsider this precedent in light of our recent decision in *Allen*, 192 Wn.2d 526. In *Allen*, this court held that "RCW 10.95.020 aggravating circumstances are elements of the offense of aggravated first degree murder for double jeopardy purposes." *Id.* at 544. As noted, because the Court of Appeals opinion in this case predated *Allen* by a year, the Court of Appeals did not consider any potential conflict with *Allen* in its analysis of our double jeopardy precedent. *See Arndt*, slip op. at 34-36. Instead, the Court of Appeals concluded that, because aggravating factors are not elements of first degree murder, the "same evidence" test is inapplicable. *Arndt*, slip op. at 35.

We recognize that our decision in *Allen* alters the *Blockburger* equation and eclipses the Court of Appeals' reasoning. It does not, however, change the central protections afforded by the Fifth Amendment. The Fifth Amendment protection from double jeopardy protects against multiple convictions for the same offense and

*multiple punishments* for the *same offense*. *Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980). "The double jeopardy clause does not prohibit the imposition of *separate punishments* for *different offenses*." *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991) (emphasis added).

In *Allen*, we explicitly addressed the difference in analysis between multiple *prosecutions* and multiple *punishments*. 192 Wn.2d at 541. Significantly, we distinguished *Kelley*, 168 Wn.2d 72, a case that considered "whether imposition of a firearm enhancement where use of a firearm was an element of the underlying offense violated the double jeopardy prohibition on multiple punishments for the same offense." *Allen*, 192 Wn.2d at 542. The court in *Allen* examined Kelley's argument that because an "enhancement" could be considered an "element" of greater offense, an unintended, redundant punishment was created in violation of double jeopardy. *Allen*, 192 Wn.2d at 542. "We concluded that since 'none of [the *Apprendi* cases][11] concern the double jeopardy clause,' their holdings did not apply." *Id.* (alteration in original) (quoting *Kelley*, 168 Wn.2d at 82). For this reason, the court in *Allen* concluded that "*Kelley* did not concern the same legal question presented here. Kelley claims he was wrongfully subjected to multiple punishments, while Allen faces multiple prosecutions." *Id.*

---

[11] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Like *Kelley*, Arndt's case concerns multiple *punishments*, not multiple *prosecutions*. The double jeopardy analysis in *Allen* does not apply to cases involving multiple punishments. *Id.* *Kelley* continues to apply and affirms the principle that "cumulative punishments may be imposed for the same act or conduct in the same proceeding if that is what the legislature intended." *Kelley*, 168 Wn.2d at 83. Accordingly, *Allen* does not prohibit the imposition of multiple punishments if legislative intent can be found in one of the four double jeopardy analytical steps articulated in *Freeman*. 153 Wn.2d at 771-73.

Because there is no express or implied articulation of legislative intent, we proceed to application of the *Blockburger* "same evidence" test. *Id.* at 772. "'[W]here *the same act or transaction* constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision *requires proof of a fact* which the other does not.'" *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (2004) (quoting *Blockburger*, 284 U.S. at 304). Despite the Court of Appeals reasoning, the State admits that the convictions at issue in this case are the same under *Blockburger* because "aggravated murder as charged *required* proof of every element of first-degree arson." Suppl. Br. of Resp't at 7-8. However, the State correctly observes

-37-

that *Blockburger* is not dispositive and that our analysis must continue to determine whether the legislature intended multiple punishments. *Id.*

Because *Blockburger* is not dispositive of legislative intent, we next look to merger analysis. *Freeman*, 153 Wn.2d at 772. "Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime." *Id.* at 772-73. One exception to the merger doctrine, however, is when overlapping offenses have independent purposes or effects. *State v. Vladovic*, 99 Wn.2d 413, 421, 662 P.2d 853 (1983). In such instances, separate punishments are allowed. *Id.* "To establish an independent purpose or effect of a particular crime, that crime must injure the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element." *State v. Harris*, 167 Wn. App. 340, 355, 272 P.3d 299, *review denied*, 175 Wn.2d 1006 (2012).

This independent purpose or effect exception applies here. Arndt was charged with aggravated first degree murder for the death of a single victim, Darcy Veeder Jr. In contrast, her conviction for first degree arson, in addition to resulting in the death of Veeder, also destroyed the O'Neils' home and was "manifestly dangerous" to the other occupants: O'Neil, Thomas, Kriefels, and the minor children. *See* RCW

9A.48.020(1)(a). Indeed, the arson charge included a separate aggravator for impact on persons other than the victim. CP at 354-55. The presence of additional victims places this case inside the "independent effect" exception to the merger doctrine that allows for the imposition of separate punishments. For this reason, allowing both of Arndt's convictions to stand does not constitute a violation of double jeopardy.

Additionally, in our merger analysis, we find that in the consideration of these two crimes, an independent purpose exists on an abstract level that also prevents the merger of the two offenses and allows for the imposition of multiple punishments. *See Freeman*, 153 Wn.2d at 773. Here, the two statutes in question are located in different chapters of the criminal code and are intended to protect different societal interests. In *Calle*, this court found support for its conclusion that the legislature intended separate punishments for the crimes of rape and incest where (1) the statutes served different purposes and (2) the statutes were located in different chapters of the criminal code. 125 Wn.2d at 780.

While this case is not exactly like *Calle*, the two crimes charged here also have separate purposes and are set forth in different parts of the criminal code. Because the primary purpose of the arson statute is to protect property, it is located in chapter 9A.48 RCW (consisting of offenses primarily intended to protect property). In contrast, because the primary purpose of the aggravated murder statute

is to protect human life, aggravated first degree murder is found in two different chapters dedicated to this end, chapter 9A.32 RCW (Homicide) and chapter 10.95 RCW (Capital punishment—Aggravated first degree murder). This provides an additional indication that the legislature clearly intended separate punishments for the crimes of aggravated first degree murder with an arson aggravator and of first degree arson. We hold that the two crimes do not merge and the imposition of multiple punishments does not violate double jeopardy.

In sum, because this case concerns the imposition of multiple *punishments* and not multiple *prosecutions*, there is no conflict with our recent holding in *Allen*. *See Allen*, 192 Wn.2d at 542; *see also Kelley*, 168 Wn.2d at 83. The legislature clearly intended multiple punishments for the crimes of aggravated first degree murder and of first degree arson. Because the crimes affected different victims and have independent purposes, the two offenses do not merge. As a result, we affirm the Court of Appeals, albeit on different reasoning, and reject Arndt's double jeopardy argument.

## CONCLUSION

The trial court did not abuse its discretion in limiting the testimony of defense expert Mann, and Arndt was not denied her Sixth Amendment right to present a defense as a result of the evidentiary rulings. Arndt was able to offer relevant

admissible testimony to rebut the State's theory, investigation, and cause and origin determinations, and to support her defense theory.

Arndt's convictions for both first degree aggravated murder and first degree arson did not violate her right to be free from double jeopardy. The legislature clearly intended multiple punishments for these crimes, and despite the factual overlap, the crimes do not merge because they have separate purposes and effects. Because this case involves multiple *punishments* and not multiple *prosecutions*, it is not affected by our holding in *Allen*. We affirm the Court of Appeals on both issues and uphold Arndt's convictions.

_____
Stephens, J.

WE CONCUR:

_____          _____
Fairhurst, C.J.                                          Wiggins, J.

                                                               _____
                                                               González, J.

_____          _____
Owens, J.                                                Yu, J.

*State v. Arndt (Shelly M.)*

No. 95396-1

MADSEN, J. (dissenting)—A defendant has a constitutional right to present a defense. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, §§ 3, 22. Shelly Arndt was stripped of that right based on a fundamental misunderstanding of the testimony of her expert witness, Dale Mann. Mann was hired to review the State's arson investigation and the conclusions of its experts; he determined both were flawed. Yet, because Mann did not conduct a separate origin and cause inquiry into the fire, the trial court precluded him from presenting his critique to the jury. This was error. Mann was called to testify not as to the cause and origin of the fire that ended the life of Arndt's boyfriend, but to highlight the weaknesses in the *State's* theory of the case. He was not required to conduct a separate inquiry because his testimony was not that there was a separate cause of the fire, but that investigators overlooked critical evidence that called their conclusions into question.

The majority finds no problem with the trial court's reasoning. I disagree. The partial exclusion of Mann's testimony violated Arndt's constitutional right to present a defense, and because it was the only evidence Arndt provided to refute the State's investigation, that constitutional error was not harmless. I respectfully dissent.

Exclusion of Portions of Mann's Testimony

Shelly Arndt engaged Dale Mann, an undisputed expert witness, to poke holes in the State's theory of the case. Fire Marshal David Lynam initially investigated the fire. He concluded that it was intentionally set by someone igniting a beanbag chair near a couch, which caught fire and spread flames through the house. Mann examined the scene and located the remnants of a plastic bucket near the couch, which Lynam's investigation overlooked. Because the bucket was stuck to the floor, Mann pried it loose with a shovel and noted that the heat from the fire melted it to that location. Mann found this significant because the type of plastic used in the bucket (polyethylene) melted at a lower temperature than the material in the beanbag chairs (polystyrene). Consequently, Mann reasoned, the bucket should have been thoroughly consumed if a beanbag chair had been ignited nearby.

Mann also tested debris from the scene, and while he found residue on a foosball table in the basement, he did not find polystyrene residue near the couch. This evidence would have contradicted Lynam's point of origin theory. Based on this evidence, Mann concluded that the cause of the fire was undetermined and that the State's investigation was incomplete.

Generally, expert testimony must satisfy both the *Frye*[1] test and ER 702. *State v. Copeland*, 130 Wn.2d 244, 256, 922 P.2d 1304 (1996). The *Frye* test is used to prevent the admission of novel scientific methods, as new techniques should be scrutinized until a

---

[1] *Frye v. United States*, 54 U.S. App. D.C. 46, 293 F. 1013 (1923).

"scientific consensus decides the methodology is reliable." *Lakey v. Puget Sound*

*Energy, Inc.*, 176 Wn.2d 909, 918-19, 296 P.3d 860 (2013). After making a

determination under *Frye*, we look to whether the evidence is admissible under ER 702 to

decide whether the expert's testimony is relevant. *See Copeland*, 130 Wn.2d at 256

(citing *State v. Cauthron*, 120 Wn.2d 879, 889-90, 846 P.2d 502 (1993)). Admissibility

under ER 702 is reviewed for abuse of discretion.

Admissibility under *Frye* is reviewed de novo and is a mixed question of law and

fact. *Id.* at 255. A party may request a "*Frye* hearing" if there is a question regarding a

scientific method. Similarly, a party may object under *Frye* if there is any question

regarding the use of a scientific method. Like a *Frye* determination itself, a decision to

have a *Frye* hearing is reviewed de novo. However, if the evidence is essentially a

defendant's entire defense, or has "extremely high" probative value, no state interest will

warrant its exclusion under the Sixth Amendment to the United States Constitution. *State*

*v. Jones*, 168 Wn.2d 713, 721, 230 P.3d 576 (2010).

In my view, ER 702 alone applies in this case because the State did not object to

Mann's testimony under *Frye*, the trial court did not hold a *Frye* hearing, and the court

did not base its exclusion ruling on *Frye*. Indeed, the trial court's basis for excluding

Mann's testimony was ER 702: Mann failed to perform a full origin and cause

investigation, thus failing to follow "reliable methodology." *Lakey*, 176 Wn.2d at 918-

19. But, as Mann repeatedly explained, he was retained solely to evaluate Fire Marshal

Lynam's work. To accomplish this, Mann reviewed Lynam's investigation and visited

the scene to collect data. He had no independent hypothesis on the origin or cause of the fire. The Mann investigation sought to verify whether Lynam's conclusions were proper, not to provide a competing theory of causation.

A full origin and cause investigation was not necessary, nor was it required. The State offered a theory on the cause of the fire, as required to meet its burden of proof. A defendant carries no burden of proof and is required to prove nothing. *State v. Camara*, 113 Wn.2d 631, 638, 781 P.2d 483 (1989) (citing *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)), *overruled in part on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). Requiring Arndt's expert to undertake an unnecessary causation inquiry shifts the burden away from the State and onto the defense and is unquestionably improper. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012) (citing *State v. Gregory*, 158 Wn.2d 759, 859-60, 147 P.3d 1201 (2006)).

Instead, I would hold Mann's testimony was relevant and admissible under ER 702. Mann was an undisputed expert with extensive training and experience as a fire and arson investigator. His testimony would have challenged the opinions and conclusions of the State's experts and explained the significance of evidence the State's investigators overlooked. *Lakey*, 176 Wn.2d at 918 (testifying witness must be an expert, and the testimony must assist the trier of fact); *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004) ("Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson." (citing *State v. Farr-Lenzini*, 93 Wn. App. 453, 461, 970 P.2d 313 (1999))).

4

Moreover, Mann's investigation was essentially Arndt's only defense. The State's experts asserted that Arndt lit the flame, igniting the beanbag chair and couch, and so committed arson as well as the other charged crimes. Mann's testimony on the plastic bucket and lack of expected residue near the couch would have undercut critical points of the State's theory. Excluding it violates the Sixth Amendment right to present a defense and was an abuse of discretion.

Harmless Error

A constitutional error is harmless if "'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (internal quotation marks omitted) (quoting *Neder v. United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). "An error is not harmless beyond a reasonable doubt where there is a reasonable probability that the outcome of the trial would have been different had the error not occurred." *State v. Powell*, 126 Wn.2d 244, 267, 893 P.2d 615 (1995) (citing *State v. Benn*, 120 Wn.2d 631, 649, 845 P.2d 289 (1993)). "A reasonable probability exists when confidence in the outcome of the trial is undermined." *Id.*

As discussed above, when the evidence is essentially a defendant's entire defense, then there is no state interest that will supersede the defendant's right to present the defense. Here, Arndt's only defense to the Lynam investigation was Mann's testimony contradicting and questioning Lynam's conclusions. The majority holds that Mann was still able to dispute some of Lynam's conclusions, thus Arndt was able to present a

5

defense. This misses the point. Mann was able to contradict the Lynam investigation only by pointing out discrepancies in the report. He was unable to directly challenge the investigation by providing data on the plastic bucket and lack of expected plastic residue Mann determined by visiting the scene. This is the only direct evidentiary challenge to Lynam's findings. Thus, it was Arndt's entire defense to the Lynam investigation, which was critical to the State's case. Excluding it was not harmless error, and the exclusion violated Arndt's constitutional right to present a defense.

Double Jeopardy

Another critical issue here is whether double jeopardy applies to an aggravator of first degree arson in a first degree murder conviction. The majority holds that because the legislature clearly intended separate punishment for the crimes of first degree murder with an aggravator of first degree arson and first degree arson itself, double jeopardy is not implicated. When considering whether cumulative punishment is appropriate, we look to (1) consideration of express or implicit legislative intent, (2) application of the "same evidence" test, (3) application of the "merger doctrine," (4) consideration of any independent purpose or effect that would allow punishment as a separate offense. *See State v. Freeman*, 153 Wn.2d 765, 771-73, 108 P.3d 753 (2005).

It should be noted that the State admits the aggravator and the crime fall under the same evidence rule. That is "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other

does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

We must also consider that the landscape of criminal jurisprudence has changed over the years. The Supreme Court held that any fact that increases the mandatory minimum sentence is an element of the crime that must be submitted to the jury. *See Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). By broadly holding so, arguably an aggravator is considered an "element" of the crime because it increases the length of punishment for a defendant. But there are other elements involved in first degree murder that may distinguish the aggravator and the crime as two separate offenses. However, the State conceded in the lower appellate court that first degree felony murder and aggravated first degree murder with first degree arson as the aggravator are based on the same conduct. It should follow that first degree arson and aggravated first degree murder with first degree arson as the aggravator also constitutes the same conduct.

*Blockburger* and the same evidence tests control unless there is "a clear indication of *contrary* legislative intent." *State v. Calle*, 125 Wn.2d 769, 778, 888 P.2d 155 (1995) (emphasis added) (citing *Albernaz v. United States*, 450 U.S. 333, 340, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981)). In other words, overcoming *Blockburger* is an uphill battle.

7

Despite the majority's stretch to find such evidence, what little it uncovers does not overcome *Blockburger* as clearly contrary legislative intent. *See* majority at 36-37, 39.[2]

This court has recently examined double jeopardy in a similar context. In *State v. Muhammad*, No. 96090-9 (Wash. Nov. 7, 2019), the prosecutors charged Bisir Bilal Muhammad with felony murder predicated on first degree rape as well as first degree rape. Muhammad challenged this as a violation of double jeopardy under *Blockburger* and the same evidence tests. A majority of this court agreed that *Blockburger* applied. I see no appreciable difference between felony murder predicated on rape and rape, and that of aggravated first degree murder with an arson aggravator and first degree arson.

Arndt also argues that her convictions should have merged. The merger doctrine applies "where the degree of one offense is elevated by conduct constituting a separate offense." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). The Court of Appeals rejected the merger argument based on a hypertechnical nuance: the aggravator did not "elevate" the degree of the offense. But the aggravator effectively increased the punishment expected by Arndt and, as noted above, is considered an element of the offense under United States Supreme Court jurisprudence. The aggravator adds additional elements to the crime and correspondingly elevates the "degree" of

---

[2] As evidence of the independent purposes and effects exception to the merger doctrine, the majority offers the different locations of arson and murder in the criminal code and the differing protections they offer. Majority at 39. The majority cites *Calle* in support, but that case did not concern the independent purposes and effects test. We discussed the criminal code and purposes underlying the crimes of rape and incest as evidence that the legislature intended to punish the offenses separately even though they were committed by a single act. *Calle*, 125 Wn.2d at 780-81.

punishment to which a defendant expects. Even if we could apply such a nuance, the rule of lenity counsels against it. *Id.* at 812-14 (applying the merger doctrine under the rule of lenity). The merger doctrine should apply here, and the first degree arson conviction should merge with the aggravated first degree murder conviction.

The majority also argues *State v. Allen*, 192 Wn.2d 526, 431 P.3d 117 (2018), does not apply because it involved multiple prosecutions, whereas here this case involves multiple punishments. However, this is a distinction without effect. *Allen* also follows contemporary jurisprudence and effectively removes the distinction between aggravating factors and elements of a charged offense. *See id.* at 539 ("It is clear that the RCW 10.95.020 aggravating circumstances are elements for Sixth Amendment purposes because they are not limited to proof of a prior conviction and, by law, they increase the minimum penalty for first degree murder."). I would hold that double jeopardy was implicated by the aggravator and the crime, and should have merged.

The majority further holds that even if the merger doctrine applies, the two offenses fall under the independent purpose or effect exception. "To establish an independent purpose or effect of a particular crime, that crime must injure the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element." *State v. Harris*, 167 Wn. App. 340, 355, 272 P.3d 299, *review denied*, 175 Wn.2d 1006 (2012). Also of note, the offense must not be "'merely incidental to the crime of which it forms an element.'" *Freeman*, 153 Wn.2d at 778-79 (quoting *State v. Frohs*, 83 Wn. App. 803, 807, 924 P.2d 384 (1996)).

9

I disagree that the independent purpose or effect exception applies here. The majority reasons that the aggravated murder charge pertained to only one victim, whereas the arson charge was "'manifestly dangerous' to the other occupants." Majority at 38. But there was no independent purpose or effect here. While the arson certainly did affect the property and others in addition to the victim here, they were merely incidental as it appears the purpose of the arson was to target the victim and not everyone else in the home. Moreover, without proof of the arson, Arndt would not be implicated by the murder of the victim. That is, if the fire was accidental, then Arndt could not be convicted of murder. Thus, the two offenses are incidental to one another and are not separate and distinct. The two offense should merge, and double jeopardy is necessarily violated.

## Conclusion

A defendant's right to present a defense is violated when the evidence excluded essentially amounts to a defendant's entire defense. Mann's testimony was the only evidence that directly challenged the State's theory of the case. By excluding it, the trial court removed Arndt's only defense against the evidence against her and violated her constitutional right to present a defense. Moreover, the conviction of aggravated first degree murder, with arson as the aggravator, and first degree arson violated double jeopardy and should have merged. I would reverse the Court of Appeals' decision and remand the case to the trial court. Accordingly, I respectfully dissent.

10

_Madsen, J._

_Geo. McCoy, J._