**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON | No. 56590-1-II |
| Respondent, | |
| v. | |
| MATTHEW J. PERRON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—In 2021, Zachary Fulleton operated as a confidential informant for the Grays Harbor Drug Task Force. During this time, he participated in three controlled buys of heroin from Matthew Perron. Following a bench trial, the trial court convicted Perron of three counts of delivering heroin and found that each offense occurred within 1000 feet of a school bus route stop.

Perron appeals his convictions. He argues that the trial court denied his right to present a defense by restricting his cross-examination of Fulleton's handler, that the trial court violated his Sixth Amendment right to counsel by improperly curtailing his closing argument, that the trial court violated the appearance of fairness, and that cumulative error deprived him of his right to a fair trial. We disagree with all of his arguments and affirm.

FACTS

During January and February 2021, Zachary Fulleton operated as a confidential informant for the Grays Harbor Drug Task Force. Sergeant Darrin King was Fulleton's handler. Under the direction of the task force, Fulleton purchased heroin from Matthew Perron on three separate occasions.

The State charged Perron with three counts of violating the Uniform Controlled Substances Act, chapter 69.50 RCW—delivery of heroin. CP 9-10. Perron waived his right to a jury trial.

At a bench trial, Sergeant King testified about his work on the drug task force handling Fulleton during the three controlled heroin buys. Before contracting Fulleton as a confidential informant, Sergeant King tested Fulleton's knowledge of drugs and dealers in the area. Fulleton approached Sergeant King about arranging a controlled drug buy from Perron in January 2021. On January 20, Sergeant King and Detective Tully did a "pre-meet" briefing with Fulleton before Fulleton attempted the controlled buy from Perron. Verbatim Rep. of Proc.(VRP) at 35. Detective Tully checked Fulleton's vehicle and Sergeant King searched Fulleton's person to make sure he did not have any drug paraphernalia or controlled substances. Detective Tully, Sergeant King, and Fulleton reviewed the safety plan for the controlled buy. Sergeant King provided Fulleton $300 of prerecorded buy money.

Fulleton picked up Perron and his girlfriend at a nearby apartment and drove them to Perron's house. Detective Tully and Sergeant King followed in unmarked vehicles surveilling Fulleton during the drive. Sergeant King witnessed Fulleton and Perron arrive at Perron's home and go inside for 15 to 20 minutes. After leaving the home, Fulleton drove to the designated meeting spot. Sergeant King conducted another search of Fulleton's vehicle and person. Fulleton gave Sergeant King heroin he purchased from Perron.

Fulleton conducted a second controlled buy on February 4, 2021. As in the first controlled buy, Sergeant King searched Fulleton's person and vehicle beforehand. Fulleton drove to Perron's home, picked up Perron and his girlfriend, and drove them to a nearby motel. Perron and his girlfriend went inside the motel for 5 to 10 minutes before returning to the vehicle. Fulleton drove

them to a nearby apartment complex before proceeding back to Perron's home. Fulleton went inside Perron's home for 15 to 20 minutes, returned to his vehicle, and proceeded to meet Sergeant King at the designated meeting spot. Fulleton gave Sergeant King two ounces of heroin he had purchased and remarked that "the town's hella dry." VRP at 64. Fulleton returned the remainder of the buy money to Sergeant King, and Sergeant King searched Fulleton's person, finding nothing.

Fulleton conducted a third controlled buy on February 17, 2021. When they met that night, Sergeant King conducted a search of Fulleton's vehicle and person. Fulleton picked up Perron at Perron's house, and they drove to a minimart where Perron's girlfriend got in the car. They returned to Perron's house where Fulleton purchased heroin. Fulleton provided the heroin to Sergeant King, and Sergeant King searched Fulleton's person and vehicle.

Sergeant King obtained a search warrant for Perron's home after the third controlled buy. When they executed the search warrant, Perron was not at the home but his teenage daughter and his girlfriend were. Sergeant King found drug paraphernalia including glass pipes, needles, baggies, residue, and spoons in every room. They also found digital scales and sharps containers.

Perron conducted extensive cross-examination of King, covering multiple topics including details of King's confidential informant agreement with Fulleton, King's expectations of Fulleton, Fulleton's criminal history, the searches King and his collegues conducted of Fulleton's person and car before and after the controlled buys, details about how the controlled buys were arranged, how much the purchased heroin cost, what King saw during the controlled buys, and items found when law enforcement searched Perron's home. Because Perron believed the confidential

informant contract set a minimum number of controlled buys per month, Perron questioned Sergeant King at length about how he counts weeks in a month.

Perron also asked Sergeant King about differences in his search warrant application and his written record of the controlled buys. Particularly, Sergeant King explained that he attempted to keep details somewhat vague in the search warrant to protect Fulleton's identity as a confidential informant. Additionally, in the search warrant application, Sergeant King did not specify which member of his team (Detective Tully or Detective Figg) specifically performed which task, instead referring to events more generally as performed by himself, the supervisor.

When Perron asked Sergeant King if he could have written the details in his reports differently, Sergeant King acknowledged he could have. Perron then asked, "Would that have been better than writing two different names in two different reports?" VRP at 106. The State objected. The trial court remarked:

> [DEFENSE COUNSEL], really? What is it we're accomplishing right now? That February 4th is in the first week of February and February 17th is the third week of February? I don't understand. And now we're asking whether he could have written his report in a different way.
>
> Do you have something more relevant that you can ask him about, please.

VRP at 106.

Perron asked Sergeant King about how he searched Fulleton before and after he went into Perron's house. Sergeant King testified that he required Fulleton to stand "prone" for the search of his person. VRP at 112. "I have them take everything out of their pockets and then I check inside. They don't have anything and—I don't get too private." VRP at 112.

In closing, Perron argued that Fulleton was motivated to fabricate the buys. He argued that no one knew what occurred inside of Perron's house; that Fulleton could have hidden drugs on his

4

person to begin with and flushed the buy money down the toilet. Perron argued, "The search that was conducted by Sergeant King was a pat down. There's plenty of places that addicts can hide drugs that would not be found with a pat down." The trial court interjected asking, "When did Sergeant King say it was a pat down? He said he searched him." VRP at 262. Perron responded, "He said it was just upon arrest, that it was just a pat down, nothing too intimate." VRP at 262. The trial court moved on, "Well . . . Okay." VRP at 262.

Perron concluded his closing argument by suggesting Perron did not sell Fulleton drugs, but rather they were two addicts using drugs together:

> The reality is that we have addicts using together. And even though that makes it a very sad reality, it is what—what we have. And Mr. Perron may have used with Mr. Fulleton three times or more, but he did not even have drugs to sell Mr. Fulleton. So with that we ask the Court to acquit him of three counts of delivery.

VRP at 263.

The trial court then engaged Perron in a colloquy with hypothetical questions such as, "[I]s it not a crime for someone to deliver heroin to another person, regardless of whether they had it—the person making the delivery had it in their home at the time that the confidential informant showed up, as opposed to having to go somewhere else to get it from a third person?" VRP at 263. The back-and-forth continued, with Perron arguing that Fulleton could have obtained the drugs from someone else. Perron pointed out that Perron's girlfriend and teenage daughter were at his home for the second and third controlled buys. The trial court responded:

> [COURT]: But is there any evidence that there was anybody else in that house on any of these three occasions?
>
> [PERRON: The two females, yes. . . .
>
> [COURT]: You mean his 15-year-old daughter? Is that one of the females you're referring to?

5

[PERRON]: Yes.

[COURT]: So you want me to find that Mr. Perron's daughter is delivering controlled substances?

[PERRON]: Your Honor, if you—a lot of the things that were found in this case were found in her bedroom.

[COURT]: Well, I understand you have to play the hand you're dealt. But, [], these arguments are not persuasive. You may be seated.

VRP at 265-66. The trial court did not ask the State if it had any rebuttal, and the court proceeded to issue its oral ruling.

The trial court convicted Perron of all three counts of delivering heroin and found that each offense occurred within 1000 feet of a school bus route stop.

Perron appeals his convictions.

ANALYSIS

I. RIGHT TO PRESENT A DEFENSE

Perron argues that the trial court violated his right to present a defense by limiting his cross-examination of Sergeant King. We disagree.

The right to present a defense is constitutionally guaranteed to all criminal defendants. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Duarte Vela*, 200 Wn. App. 306, 317, 402 P.3d 281 (2017). When reviewing a trial court's discretionary evidentiary ruling that potentially implicates the Sixth Amendment right to present a defense, we use a "two-step review process." *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). First, we review the evidentiary ruling for an abuse of discretion, then we consider de novo the constitutional question of whether the

6

ruling deprived the defendant of their right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022); *Arndt*, 194 Wn.2d at 797.

A.    Evidentiary Ruling

We review a trial court's determination of whether evidence is relevant and admissible for abuse of discretion. *Jennings*, 199 Wn.2d at 59. A trial court abuses its discretion when its decision is based on untenable grounds or reasons, such as a misunderstanding of the law. *State v. Enriquez-Martinez*, 198 Wn.2d 98, 101, 492 P.3d 162 (2021). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. In addition, ER 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Here, the evidence Perron sought to elicit from Sergeant King was at most minimally relevant. Perron elicited an admission from King that both he and another detective followed Fulleton and Perron during one of the controlled buys, but King's report did not list the second detective. *See* Clerk's Papers at 106. The cross-examination question to which the State objected was whether Sergeant King could have written his reports better by specifically naming the detectives when describing the details of the drug task force's surveillance operation. Perron argues that this evidence was relevant to show Sergeant King's credibility. But Sergeant King's answer had only minimal relevance given that King admitted his report did not specifically list the detectives surveilling during one of the buys. Moreover, all of the detectives involved in the operation testified at trial about their surveillance and what they saw. *See, e.g.*, VRP at 207, 230.

So any lack of specificity in the reports was cured by trial testimony from the detectives who were subject to cross-examination. The trial court's decision to sustain the objection was reasonable and was not an abuse of discretion.

Additionally, any error in excluding King's answer was harmless. The nonconstitutional harmless error test requires the defendant to show that "'within reasonable probabilities . . . the outcome of the trial would have been materially affected' had the error not occurred." *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015) (alteration in original) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Perron fails to show that evidence that Sergeant King could have written his warrant affidavit or reports differently or "better" could have had a reasonable probability of materially affecting the outcome of the trial. To the extent Perron sought to highlight discrepancies in the warrant affidavit and written reports, the trial court permitted him to do so. The trial court was ultimately unpersuaded by Perron's argument that Sergeant King was not credible, and it would be unreasonable to conclude that the excluded cross-examination would have changed that determination.

B.    Constitutional Question

Although the trial court's evidentiary ruling was not erroneous, we consider de novo whether the exclusion of evidence violated Perron's right to present a defense. *Jennings*, 199 Wn.2d at 58. The Washington Supreme Court recently clarified, "If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Id.* at 63.

8

"The constitutional right to present a defense ensures the defendant has an opportunity to defend against the State's accusations." *Id*. at 66. "'The Constitution permits judges to 'exclude evidence that is repetitive . . . , only marginally relevant[,] or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (alterations in original) (internal quotation marks omitted) (quoting *Crane v. Kentucky*, 476 U.S. 683, 689-90, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)). Where the defendant's evidence is minimally relevant, but he had the opportunity to present his version of the incident, even if some evidence was excluded, a defendant's right to present a defense is not violated. *Jennings*, 199 Wn.2d at 66-67; *see also State v. Hudlow*, 99 Wn.2d 1, 18, 659 P.2d 514 (1983).

As previously discussed, the evidence excluded by the trial court was at most only minimally relevant. Moreover, the trial court's ruling did not restrict Perron's ability to present his theory of the case—that surveillance and handling of the controlled buys was imperfect to the point that the State could not prove where Fulleton got the heroin. Perron questioned Sergeant King at length about the minor discrepancies in his warrant affidavit and written reports before the trial court upheld the State's objection to Perron's question about whether Sergeant King could have written his reports in a different way. And Perron was able to elicit sufficient testimony about other people who were present during the buys that he could argue in closing that someone else could have sold Fulleton the heroin. We hold that Perron's right to present a defense was not violated by the trial court's evidentiary ruling.

## II. RIGHT TO CLOSING ARGUMENT

Perron argues that the trial court denied his right to counsel by improperly curtailing his closing argument. We disagree.

A criminal defendant's "right to counsel encompasses the delivery of closing argument." *State v. Frost*, 160 Wn.2d 765, 768, 161 P.3d 361 (2007). Trial courts have broad "discretion over the scope of closing argument." *Id*. Accordingly, we review these challenges for an abuse of discretion. *Id*. A trial court abuses its discretion "'only if no reasonable person would take the view adopted by the trial court.'" *Id*. at 771 (quoting *State v. Perez–Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)). In all cases, the trial court should "'restrict the argument of counsel to the facts in evidence'" and should confine its arguments to the relevant law. *See id*. at 772 (quoting *Perez–Cervantes*, 141 Wn.2d at 475).

The record does not support Perron's argument that the trial court "curtail[ed], argu[ed] with, and ultimately terminat[ed] counsel's argument of the case in summation." Br. of Appellant at 22. The only time the trial court interjected into Perron's closing argument was to ask when Sergeant King testified that his search of Fulleton was simply a pat down. The court asked Perron to clarify the evidence in the record, heard Perron's response, and permitted Perron to continue his argument in summation. Under ER 611(a), the trial court should restrict counsel's argument to the facts in evidence and therefore it was not unreasonable for the court to clarify Sergeant King's actual testimony during closing argument in a bench trial. *Frost*, 160 Wn.2d at 772.

On appeal, Perron characterizes the trial court's subsequent inquiries as "constantly interrupting counsel to argue with her," but the record does not support this contention. After Perron concluded his closing argument by saying "with that we ask the Court to acquit [Perron] of

three counts of delivery," the trial court engaged Perron in a series of hypothetical questions. VRP at 263. The trial court ultimately was not persuaded by counsel's responses, but the court's colloquy did not amount to arguing with counsel. Based on the record, we hold that the trial court's inquiries during and after Perron's closing argument were not an abuse of discretion and did not unconstitutionally deprive Perron of his Sixth Amendment right of counsel to argue the case in closing.

### III. APPEARANCE OF FAIRNESS

Perron also argues that the trial court violated the appearance of fairness doctrine. We disagree.

The appearance of fairness doctrine demands the absence of actual or apparent bias on the part of the trial court. *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). "Pursuant to the appearance of fairness doctrine, a judicial proceeding is valid if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *Id*. Under this doctrine, a presiding judge must actually be impartial and also appear to be impartial. *Id*. The question is "whether the judge's impartiality might reasonably be questioned." *Id*.

To make this determination, we apply an objective test that assumes a reasonable person knows and understands all the relevant facts. *Id*. The party asserting a violation has the burden of showing evidence of a judge's actual or potential bias. *Id*. We presume "that a trial judge properly discharged [their] official duties without bias or prejudice." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

The trial court's admonition during Perron's cross-examination of Sergeant King did not rise to the level of bias or prejudice. The trial court has the authority to control the presentation of evidence. ER 611(a). Nor did the trial court's inquiries and comments following Perron's closing argument violate the appearance of fairness. Contrary to Perron's characterization on appeal, the trial court did not cut him off or prematurely end his closing argument. Perron finished his closing argument before the trial court engaged him in a colloquy inquiring further about his defense theory and arguments. That the trial court ultimately found Perron's arguments unpersuasive does not equate to a showing of actual or potential bias.

Given our presumption that a trial judge acts without bias or prejudice, we hold that Perron fails to show that a reasonable person would conclude he received an unfair trial.

## IV. CUMULATIVE ERROR

Finally, Perron argues that the cumulative errors in this case denied him of his right to a fair trial. We disagree.

Perron fails to identify any trial error and therefore fails to carry his burden to show that cumulative error denied him of his right to a fair trial.

We affirm.

56590-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Birk, J[1].

Che, J.

---

[1] Sitting in Division II pursuant to RCW 2.06.040 by order of the Associate Chief Justice.