IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39766-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| PATRICK GABRIEL MATHIS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Patrick Mathis appeals his conviction for assaulting his wife and malicious mischief. He argues that the superior court committed error when precluding evidence of his wife assaulting another person at a bar earlier on the night of Mathis' row with his wife. He insists that evidence of the bar confrontation held relevance to his claim of self-defense when he and his wife later fought. We reject the assignment of error because Mathis presented no testimony that his grabbing, choking, and shoving of his wife resulted from a fear instilled in him because of the wife's earlier bar fight. We remand to the superior court to conduct a full inquiry full inquiry as to Mathis' ability to pay legal financial obligations.

FACTS

This appeal arises from a confrontation between appellant Patrick Mathis and his wife, Misty Leighter, at their mutual residence on September 15, 2021. We write a

lengthy narration of the facts and the procedure because of a desire to pinpoint the testimony of Mathis and assess whether that testimony bore relevance to his claim of self-defense. We take the facts principally from trial testimony.

A visit to a bar preceded the confrontation between Patrick Mathis and Misty Leighter. On September 15, the husband and wife socialized with friends at Big Daddy's Sports Bar in Ephrata. They had driven each other's car to the bar. One of the friends upset Leighter. In a fit of anger, Leighter threw her phone at the man's face and physically confronted him. Video footage from the bar, lasting eight seconds, showed Leighter walk from the table, turn, and throw a phone that hit a person in the face. The jury did not view the video. Mathis restrained his wife by holding her arm.

Patrick Mathis' failure to side with Misty Leighter drew her ire. Leighter left Big Daddy's Sports Bar and drove Mathis' car to her mutual residence with Mathis in Quincy. After being briefly at the Quincy home, she left that home and journeyed to her sole residence in Ephrata. Thereafter, she returned to the Quincy home.

During her drives, Misty Leighter left Patrick Mathis angry voice messages. The messages included:

> How do you expect me to put up with these mother fuckers, your friends are pieces of shit.
> . . . .
> Are you scared of him? Should I have been the one to punch him out.
> . . . .

> I'm really mad at you. I'm so tired of you not sticking up to your piece of shit friends.

RP at 221. In response, Mathis sent Misty Leighter texts, one of which read that he still loved her.

Patrick Mathis left Big Daddy's bar shortly after Misty Leighter exited. Mathis went to the respective houses of two friends before returning home to the Quincy residence shared with Leighter. When Mathis returned home, Leighter was not present. Leighter continued to send Mathis voice messages. Leighter thereafter returned to the mutual home. The husband and wife then confronted one another ninety minutes after Leighter's bar altercation.

The stories of Misty Leighter and Patrick Mathis overlap some, but also diverge some. According to Misty Leighter, she and Patrick Mathis were both heated and yelling at one another. Leighter retired to the bedroom because she did not wish to speak further to Mathis. Mathis continued to talk as she entered the room and locked the door. Mathis yelled more. He pounded and kicked the bedroom door until he busted the door frame and latch.

Misty Leighter continued her narrative at trial that, once Patrick Mathis entered the room, he walked to the side of the bed where she sat. He yelled more. He demanded the key to his car, which Leighter had placed in her purse. The purse laid on the floor.

Leighter stood and informed Mathis she would not surrender the key. Mathis possessed the key to Leighter's car, and she wanted access to one car in order to leave the house.

According to Misty Leighter, Patrick Mathis pushed her. She shoved back, leading to more shoving and grabbing . Mathis eventually shoved Leighter to the bed. He then grabbed Leighter's throat with one hand and squeezed the throat. Mathis slowly and calmly lectured Leighter on military tactics:

> I have you in a special hold, do you know what this is? I learned this in the military. I could kill you right now. Do you want to die right now? Do you want to die right now?

RP at 210. At this time, Leighter did not fight back. At trial, Leighter could not estimate how long Mathis choked her. He eventually released her and took the keys from the purse. At trial, the State introduced into evidence photographs showing marks on Leighter's throat.

According to Patrick Mathis, an angry Misty Leighter, when she entered the residence, yelled as she walked toward the bedroom. She slammed the bedroom door shut. Leighter continued to yell from the bedroom. She shouted that she was leaving the house and the two would be divorced in ninety days.

Patrick Mathis testified that he decided to leave the residence, but needed the key to his car. He asked Leighter multiple times for his car key. She refused to release the key. So he used force to enter the locked bedroom.

4

According to Patrick Mathis, he entered the bedroom only for the purpose of retrieving his car key. Leighter lay or sat on the bed. Mathis went to the far side of the bed where Leighter's purse laid. Mathis stooped to grab the key from Leighter's purse. He then felt a bite on his ear. Leighter bit twice. At trial, Mathis showed a picture of his bitten ear that depicted a missing part of the ear.

Patrick Mathis testified that he twisted around, held Misty Leighter's arm, grabbed her neck, and pushed her to the bed. Mathis denied strangling Leighter. He did not intend to stop the flow of air. He grabbed his key and exited the room. As he waited in the living room, Leighter left the residence.

Patrick Mathis did not testify that Misty Leighter's altercation in Big Daddy's Bar prompted him to take any action in defense of himself that evening. He testified to holding her arm, grabbing her neck, and pushing her only in the context of her biting his ear.

After she left the residence, Misty Leighter called her son and solicited his assistance. She later returned to the Quincy residence. Police arrived and interviewed both spouses. Mathis told officers that he merely sought to retrieve his keys when Leighter struck him from the bed. He informed officers that after his wife bit his ear, he sought to stop his wife's blood flow, which would prevent her continuing her attack, a maneuver learned in the military.

During trial, Patrick Mathis testified that Misty Leighter would lose her job if the State charged her with assault, thereby implying that he took the blame for the altercation. He added that he would not lose his job if convicted of assault.

PROCEDURE

The State of Washington charged Patrick Mathis with assault in the second degree by strangulation or suffocation, with a special allegation that the victim was an intimate partner. The State later added a charge of malicious mischief in the third degree. At trial, Patrick Mathis asserted the defense of lawful use of force or self-defense.

In a motion in limine, the State sought to exclude, under ER 401, 402, 403, and ER 404(b), the video clip and testimony regarding the altercation at Big Daddy's bar between Misty Leighter and Patrick Mathis' friend. The State emphasized the bar altercation was disconnected from the subsequent violence in the couple's bedroom. The State insisted evidence of the fight was overly prejudicial and would result in a mini-trial over the bar quarrel.

In response to the State's motion in limine, Patrick Mathis contended that the bar incident and the couple's altercation constituted one continuous chain of events. Mathis highlighted that Leighter maintained her own separate home, at which she could have remained for the night, but instead returned to the other residence in order to harass him.

The trial court excluded the video clip and testimony under ER 403 and ER 404(b). According to the court, the video lacked relevance because the altercation at

6

home occurred hours later.  Nevertheless, the court allowed Mathis to testify and argue

that an incident occurred at a bar, Leighter became upset, she exited the bar, she

thereafter called Patrick Mathis many times, and Mathis grew concerned about the angry

behavior of Leighter.

During the trial cross-examination of Misty Leighter by defense counsel, the

following exchange occurred:

> Q. All right.  Now, you said that this argument was going on in the house, correct?
> A. Yes, sir.
> Q. But it started before then, right?
> A. Yes, sir.
> Q. Where did it start?
> MR. JENKS [the State's attorney]: I'm going to object.  We've already addressed this.
> THE COURT: Okay.  She can answer the question of where it started.
> A. When we were having drinks and dinner.
> BY MR. SCHIFFNER [Defense counsel]: Q. Where?
> A. At the Daddy's, Big Daddy's here in town.
> Q. Okay.  You were there with your husband?
> A. Yes.
> Q. There were two other –
> A. We met there, actually.
> Q. Right.  He drove there on his motorcycle?
> A. I believe so.
> Q. You drove there in his Jeep?
> A. Yes, sir.
> Q. And there were two other individuals at your table?
> MR. JENKS: Objection same issue.
> THE COURT: Yes.  We can move on, Mr. Schiffner, please.
> BY MR. SCHIFFNER: Q. All right. Well at least can I ask it, after an incident, did you leave, did you storm out?
> A. Yes, I was upset and I left.

Q. Okay.  Who were you upset at?

A. At him and his friend.

Q. Okay. Specifically, why were you angry at him?

A. He wasn't standing up for me.  His friend was saying horrible things to me and he didn't stand up for me.

Q. You believe that he should have done something for you?

A. I believe that he should have asked his friend to not talk like that to me.

Q. Okay.  And so you were upset with him and you left?

A. Yes, sir.

Q. Okay.  Did you go home?

A. At first, yes.

Q. And did you stay there?

A. No.

Q. Where did you go after that?

A. To my house here in Ephrata.

Q. And did you go back to the house?

A. Yes.

Q. And he wasn't there yet, correct?

A. No, he was there that time, I believe.  He wasn't there the first time I went there and I was upset and that's why I left.

RP at 218-220.

Defense counsel questioned Misty Leighter about voice messages she sent to Patrick Mathis after leaving the bar.

Q. In that intervening period, did you send him 20 voice messages?

A. Probably.  I was really upset.  And he texted me back.

Q. Could one of them have been, "How do you expect me to put up with these mother fuckers, your friends are pieces of shit?"

A. Maybe so.

Q. "Are you scared of him?  Should I have been the one to punch him out?"

A. I honestly don't remember this.

Q. "I'm really mad at you.  I'm so tired of you not sticking up to your piece of shit friends."

A. It wasn't the first time, sir.

8

Q. "And you didn't say a fucking word, did you?"

MR. JENKS: Was that your question?

MR. SCHIFFNER: No, that's –

MR. JENKS: So I'm going to object. The point is that there was an argument. The fact that –

THE COURT: Okay. Your objection is sustained. Move on, Mr. Schiffner.

MR. SCHIFFNER: All right.

THE COURT: Thank you.

MR. SCHIFFNER: Because I have the 20 of them if you want to play them.

BY MR. SCHIFFNER: Q. Now, you said that he texted you; is that correct?

A. I believe so. I honestly don't remember the extent of the texting. Like I said, I was pretty upset.

Q. Was one of them said, from him to you, "Wherever you decide to spend the night, all I ask" –

MR. JENKS: Your Honor, again, we –

THE COURT: Yes, I'm going to sustain. Move on, please. Thank you.

MR. SCHIFFNER: Well, but it talks about the incident at the house.

THE COURT: So this is a text for after the incident at the house?

MR. SCHIFFNER: Yes.

THE COURT: Okay. I'm sorry. Go ahead and ask that question again.

MR. JENKS: I haven't even seen that.

THE COURT: Go ahead and ask the question.

BY MR. SCHIFFNER: Q. "Wherever you decide to spend the night, all I ask is that you let me know that you are safe. At the end of the day, I still love you with all of my heart.

I tried to keep this non-physical, but you ripped my ear open."

THE COURT: I'm sorry, what's your question?

BY MR. SCHIFFNER: Q. Did he send that text to you?

A. I don't remember, to be honest.

RP at 221-23.

Patrick Mathis testified on his behalf. At the beginning of his examination, the

9

following colloquy occurred between Mathis and his counsel:

> Q. Now, I want to start earlier in the evening, but as you know, we can't talk about what went on at Big Daddy's other than to say that some event happened. Correct?
> A. Yes, sir.

RP at 306-07. Mathis did not testify that an incident occurred at the Big Daddy's Sports Bar or that Leighter became upset as a result of the altercation. Mathis testified that Misty Leighter sent him twenty angry voice messages. He did not expressly testify that the bar incident caused her ire.

Patrick Mathis testified he entered the bedroom to gain possession of his car key. The ease, at which he forcibly opened the bedroom door, surprised him. He walked to the side of the bed to garner the key from his wife's purse. As he leaned down to reach the purse, he felt a sharp pain in his ear from Leighter biting him. In response, he grabbed her arm and neck and pushed her onto the bed to restrain her.

The trial court delivered a first aggressor instruction to the jury. The jury convicted Patrick Mathis on assault and malicious mischief.

The superior court sentenced Patrick Mathis to six months in jail. The court asked if Mathis could afford to pay the victim penalty assessment, the domestic violence assessment, and the court filing fee. Defense counsel responded that Mathis will lose his job in thirty days and will then have no income. The superior court imposed a $500 victim penalty assessment, a $200 criminal case filing fee, a $100 domestic violence

assessment, and a $100 DNA collection fee.  The court commented: "He can apply for a waiver later.  I'm going to leave it now as is."  RP at 13.  The court granted Mathis' request to proceed in forma pauperis on appeal.

## LAW AND ANALYSIS

On appeal Patrick Mathis assigns error to the superior court's exclusion of evidence relating Misty Leighter's assault on a man at the bar.  The assignment of error focuses on Mathis' raising the defense of self-defense.  Mathis may wish the court to deem self-defense as a defense to malicious mischief.  RCW 9A.16.020(3) may extend the defense to malicious mischief.  Nevertheless, we do not address whether the accused may assert self-defense against charges of malicious mischief, because a ruling on this question is unnecessary.  Assuming we affirm his convictions, Mathis assigns error to the imposition of a DNA collection fees and other legal financial obligations.

### Exclusion of Evidence

Patrick Mathis seeks reversal of his convictions on evidentiary rule error and constitutional error.  Both the alleged rule error and constitutional error relate to the same evidentiary ruling that barred evidence of the bar altercation.  Mathis argues that the superior court misapplied ER 403 and ER 404(b) because the details of the clash posed relevance to his self-defense defense.  He also contends that the ruling violated his right to a fair trial found in the United States Const. Sixth Amendment and Wash. Const. art. I, § 22.

Patrick Mathis characterizes the superior court's ruling as preventing him from showing that Misty Leighter initiated a confrontation at Big Daddy's Sports Bar, that he restrained her at the bar, and that his action angered Leighter further. He does not mention, however, that the superior court permitted testimony that an incident at the bar occurred, that Leighter became upset, that she exited the bar, that she thereafter called and texted Mathis many times, and that Mathis became concerned about the angry behavior by Leighter.

RCW 9A.16.020(3) authorizes the defense of self-defense for non-homicide prosecutions:

> The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
> . . . .
> (3) Whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary.

In considering a claim of self-defense, the jury must consider all the facts and circumstances known to the defendant. *State v. Wanrow,* 88 Wn.2d 221, 234, 559 P.2d 548 (1977) (plurality opinion); *State v. Duarte Vela*, 200 Wn. App. 306, 319, 402 P.3d 281 (2017). The vital question becomes the reasonableness of the defendant's apprehension of danger. Generally, evidence of a victim's propensity toward violence known by the defendant is relevant to a claim of self-defense because such testimony

tends to show the state of mind of the defendant and to indicate whether he, at that time,

had reason to fear bodily harm. *State v. Adamo,* 120 Wash. 268, 269, 207 P. 7 (1922);

*State v. Duarte Vela*, 200 Wn. App. 306, 319, 402 P.3d 281 (2017).

An accused possesses a constitutional right, under the Sixth Amendment and

Washington Const. art. 1 § 22, to present a defense. *State v. Hudlow*, 99 Wn.2d 1, 16,

659 P.2d 514 (1983). But that right is not absolute and does not extend to the

introduction of all evidence forwarded by the accused. *State v. Arndt*, 194 Wn.2d 784,

812, 453 P.3d 696 (2019). The State's interest in excluding evidence must be balanced

against the defendant's need for the information sought to be admitted. *State v. Arndt*,

194 Wn.2d 784, 812 (2019).

ER 403, applied in favor of both the accused and the State declares:

> Although relevant, evidence may be excluded if its probative value
> is substantially outweighed by the danger of unfair prejudice, confusion of
> the issues, or misleading the jury, or by considerations of undue delay,
> waste of time, or needless presentation of cumulative evidence.

ER 404(b) reads:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes,
> wrongs, or acts is not admissible to prove the character of a person in order
> to show action in conformity therewith. It may, however, be admissible for
> other purposes, such as proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or accident.

We need not thoroughly contemplate whether the superior court abused its

discretion when applying ER 403 or ER 404(b) or whether the superior court breached

13

Patrick Mathis' fair trial right.  We agree that Patrick Mathis' presence at Misty Leighter's bar altercation and some limited testimony of the nature of the altercation might bear relevance to Mathis' claim of self-defense but only if the bar row influenced his later behavior.  But Mathis never testified that his conduct in twisting, grabbing, and choking Leighter resulted from a fear of an attack that arose because of the bar altercation.  He stated he broke down the door only to seize his car key.  He did not take any immediate defensive steps once he entered the bedroom.  Instead, he calmly walked to the side of the bed to obtain the key.  According to Mathis, he used violence only after and because Leighter bit his ear.  He did not claim that he, because of knowledge of the bar fight, used some additional violence beyond what he needed to wreak in order to end the biting.  Thus, the bar fight lacked any relevance to the issues presented by either side.

We might agree that the superior court restricted evidence beyond the need to correctly apply ER 403 and 404(b), but the court did allow Patrick Mathis to testify that an altercation occurred in Big Daddy's Bar and that his conduct at home was motivated in part because of the squabble.  But, despite being allowed to do so, Mathis never testified he responded to the ear bite in a manner that reflected some fear of Misty Leighter resulting from the bar altercation.  Mathis instead testified that he grabbed, choked, and shoved Leighter, based on military training, in order to end the biting.

14

DNA Collection Fee

At sentencing, the superior court imposed a $100 DNA collection fee on Patrick Mathis. Mathis challenges the fee.

LAWS OF 2023, ch. 449, § 4 revoked the DNA fee effective July 1, 2023. In *State v. Ellis*, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023), July 1, 2023 had not arrived by the time of the decision. Nevertheless, the court directed the erasure of the DNA fee because the decision's mandate would issue after July 1.

The State concedes Patrick Mathis' DNA fee should be revoked. We remand to the superior court to remove the imposition.

Other Legal Financial Obligations

The superior court imposed a victim penalty assessment, a domestic violence assessment, and a court filing fee for a total of $800 in legal financial obligations. On appeal, Patrick Mathis argues that the trial court failed to conduct the individualized inquiry into his current and likely future ability to pay discretionary legal financial obligations such that this court should order cancellation of the obligations.

In response, the State first contends that Patrick Mathis waived any error by failing to object, at sentencing, to the imposition of legal financial obligations. Second, the State highlights that, during trial, Mathis testified that he would not lose his job if convicted. This testimony conflicted with defense counsel's comment, during sentencing, about Mathis losing his job. Since Mathis previously testified under oath that he could still

work, this court, according to the State, should conclude that Mathis is able to pay the obligations. Third, the State highlights that the court conducted an inquiry as to Mathis' ability to pay and concluded he could pay.

Under RCW 10.01.160(3), a trial court should not impose discretionary legal financial obligations on one convicted of a crime unless he has the present or likely future ability to pay. As of July 1, 2023, the legislature precluded imposition of the victim penalty assessment on one found to be indigent under RCW 10.01.160(3). RCW 10.99.080(1) renders the domestic violence assessment discretionary. RCW 36.18.020(h) demands that the sentencing court withhold the imposition of the court filing fee for indigent defendants.

*State v. Blazina*, 182 Wn.2d 827, 833, 344 P.3d 680 (2015), mandates that a trial court make an individualized inquiry on the record before imposing discretionary legal financial obligations. A defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review. *State v. Blazina*, 182 Wn.2d 827, 832 (2015). Still, the reviewing court remains free, under RAP 2.5(c), to grant review. *State v. Blazina*, 182 Wn.2d 827, 834-35 (2015). National and local cries for reform of broken LFO systems suggest the court should reach the merits of the case. *State v. Blazina*, 182 Wn.2d 827, 835 (2015).

Patrick Mathis' sentencing court did not engage in a thorough individualized inquiry as to the assets, income, and debt of Mathis. We recognize that Mathis testified

that he would keep his job, but such testimony does not automatically preclude him from being declared indigent. The superior court declared Mathis indigent for purposes of the appeal. Because of the financial harm that legal financial obligations may impose on one released from prison, we exercise our discretion and remand the sentence to the superior court to engage in a thorough inquiry as required by *State v. Blazina*.

CONCLUSION

We affirm Patrick Mathis' conviction. We remand for resentencing at which time the superior court should conduct a full inquiry as to Mathis' ability to pay discretionary legal financial obligations.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Melnick, J.P.T.[1]

_____
Staab, A.C.J.

---

[1] Rich Melnick, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).