# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59834-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JAVIER RANGEL CHAVEZ, | |
| Appellant. | |

PRICE, A.C.J. — After a bench trial, Javier R. Chavez was convicted of three counts of first degree child molestation.  Chavez appeals, arguing that the trial court violated his right to present a defense when it excluded evidence that the victim may have fabricated allegations under oath in an unrelated  matter.   Chavez also argues that insufficient evidence supports his convictions because the trial court relied on an erroneous finding to reach its conclusion.  We affirm.

FACTS

In 2019, D.G. accused Chavez, her uncle, of having sexual contact with her multiple times when she was between the ages of eight and twelve years old.[1]  Based on D.G.'s claims, the State charged Chavez with three counts of first degree child molestation.[2]

---

[1] Based on D.G.'s age at trial, the alleged abuse would have been occurring from 2003 to 2006 or 2007.

[2] The State also charged Chavez with one count of intimidating a witness and one count of harassment.  These counts were ultimately dismissed.

Chavez waived his right to a jury, and the case proceeded to a bench trial.

I. TRIAL

The State's case relied heavily on the testimony of D.G., who described repeated incidents of molestation beginning around 2003, when she was eight years old. Also testifying for the State were Valentina Chavez[3] (D.G.'s mother), Samantha Carter (D.G.'s wife), as well as members of law enforcement and a forensic interviewer.

Chavez categorically denied the allegations and challenged D.G.'s credibility, in part, through inconsistencies in her statements.

A. D.G. TESTIMONY

The three counts of first degree child molestation were rooted in incidents generally taking place in three locations—specifically, an incident at her aunt's apartment, an incident in a shed in her parents' backyard, and many incidents upstairs at her parents' house. D.G. testified as to each one.

D.G. first described her experience of the incident at her aunt's apartment in Vancouver, Washington. She was 8 years old, and it was the first time she remembered Chavez touching her. D.G. testified that her parents dropped her off at her aunt's apartment because they had to work. D.G. went inside and started looking for her cousin Pedro. She found Chavez instead in the bedroom he shared with Pedro. Chavez was on the bed. Chavez told D.G. to close the door, and then he lifted the bed sheet and asked D.G. to join him under the covers. D.G. got into bed, assuming it was just "to lay down with him and cuddle." 1 Verbatim Rep. of Proc. (VRP) at 150.

---

[3] We refer to Valentina by her first name for clarity because she shares her last name with the defendant.

She thought it would be normal to cuddle with family, since she had previously cuddled with her parents and aunts. But D.G. testified that Chavez eventually began to "dry hump" and grope her, providing a detailed description of how Chavez touched her body and rubbed his body against her over her clothing. 1 VRP at 154. When it was over, she left the bedroom and did not tell anyone about what had happened.

D.G. next testified to the incident in the shed in her parents' backyard. According to D.G., this incident would have taken place around 2006, when she was "maybe eleven." 1 VRP at 178. On the day of the incident, her parents asked Chavez to get something from the shed, and Chavez asked D.G. to go with him. D.G. testified that once she and Chavez were inside the shed, he grabbed her and began to "dry hump[]" her and thrusted against her. 1 VRP at 175, 177. He then moved his hands under her shirt so that he could touch her breasts "[s]kin to skin." 1 VRP at 178. When it was over, D.G. and Chavez rejoined her parents. D.G. did not tell anyone about what happened because "[she] was always too scared." 1 VRP at 180.

D.G. then testified about the other, "over twenty," remaining incidents, all of which happened in a bedroom at her parents' house around or before 2006. 1 VRP at 180. D.G. recalled that Chavez would refer to these incidents as "playing," saying things like " 'let's go play upstairs.' " 1 VRP at 180-81. But as D.G. got older and started refusing to "play," Chavez would become insistent. When Chavez was unrelenting, D.G. would eventually comply and join him upstairs. D.G. testified that Chavez would most often position her in front of two large windows, presumably so that he could see out the window while he touched her in case her brothers were outside or her parents came home. Eventually, D.G. would try to avoid going home altogether

whenever she saw Chavez's car parked out front, which she described as a "red car." 1 VRP at 308, 379.

D.G. explained that the incidents had escalating skin to skin contact between their bodies. Sometimes Chavez would attempt to penetrate her with his fingers or his penis, but he was unable to. D.G. provided details of where Chavez touched her, how he touched her, and what parts of Chavez's body were involved. She explicitly confirmed that Chavez never used his fingers to penetrate her vagina nor did she ever bleed as a result.

D.G. also described the impact that the abuse had on her. She said it left her persistently fearful, uncomfortable in the presence of men, and prone to "freezing" during sexual contact. *See* 1 VRP at 367. She never disclosed the abuse to professionals because she was frightened and did not understand what had occurred. She experienced recurring nightmares, insisted on locking her doors to feel safe, and struggled with suicidal ideation during adolescence. She admitted she was very distressed when she reported the abuse to law enforcement.

Chavez's cross-examination of D.G. uncovered some inconsistencies in her testimony. For example, D.G. previously stated that incidents at her parents' home had all occurred "inside of the house, not outside," which conflicted with her testimony about the incident in the shed. 1 VRP at 323-24. D.G.'s claims of being touched in front of large windows also led to questions regarding whether neighbors could have seen what was happening through the windows. D.G. was also asked about whether her parents' shed was actually constructed long after her allegations of abuse, in 2010. D.G. responded that there may have been a different shed. Finally, D.G. provided varying accounts regarding where her brothers were during incidents, whether there was direct contact

4

between particular intimate areas, the frequency of the abuse, and the extent of disclosures to friends.

At one point during D.G.'s cross-examination, Chavez sought to impeach D.G. with sworn declarations that D.G. had provided in an unrelated protection-order petition against her wife, Carter.[4] As an offer of proof, Chavez introduced excerpts from the transcript of Carter's defense interview. In the interview, Carter said that D.G. acknowledged that she lied in her protection-order petition:

> [Defense Interviewer]: Did [D.G.] ever acknowledge and tell you that she did lie and that she knew that all that was a lie?
>
> [Carter]: Um, yes. When—after she put [the protection order] on me, a couple months after, [D.G.] contacted me. And she just said that she was sorry.
>
> . . . .
>
> [Defense Interviewer]: And what you're telling me is [D.G.] apologized to you for all the lies that she told the court when she filed that petition that we just went over. Correct?
>
> [Carter]: Yes.

Clerk's Papers (CP) at 62, 68, 135.

In a written bench memorandum, Chavez argued that Carter's responses from the transcript provide a basis to believe that D.G. would (or at least, in Chavez's view, should) confirm that D.G. both made past false accusations and that she admitted this to Carter. Chavez claimed that because D.G. was "an extremely crucial witness[, t]he false accusations she . . . made hold significant impeachment value, overshadowing any other potential impeachment evidence that may or may

---

[4] The issue of D.G.'s sworn statements in this petition was not new to the trial court. In related pretrial motions in limine, Chavez referenced this protection-order petition as supporting a "history of fabricating allegations in court" and argued that it highlighted D.G.'s "propensity to leverage court accusations for personal gain." Clerk's Papers at 116. The trial court reserved ruling on the motions.

not materialize." CP at 137 (emphasis omitted). The State objected, contending that the evidence had an insufficient factual basis and was related to an irrelevant, collateral issue with a high risk of prejudice.

After an extensive discussion, the trial court, citing ER 608, permitted defense counsel to ask D.G. whether she had made false allegations in the petition and determined that, depending on D.G.'s answers, the issue could be reraised during Carter's expected testimony. Thereafter, D.G. denied that she had made any false accusations:

> [Defense:] Did you apologize to Samantha Carter for making false accusations to her in your efforts to obtain a protection order?
>
> [D.G.:] No.
>
> [Defense:] In your efforts to obtain a protection order against Samantha Carter, did you make any accusations against her that were false?
>
> [D.G.:] No.

1 VRP at 304-05.

B. VALENTINA'S TESTIMONY

D.G.'s mother, Valentina, testified about situations where D.G. would be alone with Chavez and the changes in D.G.'s demeanor over time. Valentina explained that during D.G.'s elementary-school years, D.G. frequently returned to an empty home because both parents worked and were sometimes away on weekends, thereby creating opportunities for Chavez to be alone with D.G.

Valentina further described a noticeable shift in D.G.'s behavior—whereas D.G. had been a very happy and high-performing child before age eight, she became rebellious and rude between ages eight and twelve. D.G. began to struggle in school and later expressed suicidal ideation as a teenager. And D.G.'s attitude toward Chavez deteriorated significantly between approximately

ages nine and twelve, shifting from affection to open hostility and avoidance. D.G. had told Valentina that Chavez "wasn't a good person." 1 VRP at 420. Valentina also testified that she observed Chavez directing inappropriate looks at D.G., "making fun of [D.G.]" and "laughing at her." 1 VRP at 434. But she clarified that she never personally observed anything sexually inappropriate between the two.

On cross-examination, Valentina confirmed that there were some inconsistencies in D.G.'s version of events over time, including, for example, that when D.G. first told her about Chavez's abuse, D.G. said "that he put his fingers inside her vagina and caused her to bleed from the vagina." 1 VRP at 464.

## C. CARTER'S TESTIMONY

D.G.'s wife, Carter, testified about D.G.'s behavior and its effect on their intimate relationship. Carter explained that D.G. consistently disliked sexual contact and became visibly uncomfortable when Carter attempted to initiate intimacy. Carter described a 2016 encounter in which D.G. immediately pushed Carter's hand away when Carter attempted to touch her sexually, bringing the encounter to an abrupt end. The two had infrequent sexual activity, and Carter had a persistent sense that she "couldn't touch" D.G. 1 VRP at 480. These challenges had caused strain on their marriage. Carter went on to testify that although these difficulties had led to them initiating divorce proceedings, they were currently attempting to reconcile.

On cross-examination, Carter's testimony seemed to show that D.G had been inconsistent in her reporting of the abuse from Chavez. For example, Carter explained that D.G. had stated that the abuse occurred in a bedroom at night while she was sleeping as opposed to D.G.'s testimony that the abuse largely occurred during the day, after school.

As anticipated, the issue of D.G.'s alleged false statements on her protection-order petition against Carter was raised. Defense counsel requested to impeach D.G. by questioning Carter regarding D.G.'s alleged truthfulness on the petition. The State repeated its earlier objections, citing ER 608(b)'s prohibition of using extrinsic evidence to impeach a witness.

Similar to the offer of proof made while D.G. was on the witness stand, defense counsel provided the following offer of proof from Carter in which Carter said that D.G. had made false accusations of assault in the petition and that D.G. had admitted the allegations were untrue.

> [Chavez:] So did [D.G.] lie twice about you to get protection orders?
>
> [Carter:] Yes.
>
> [Chavez:] . . . Now, I'll read your answer or the question and answer and you can tell me if it refreshes your recollection, since we're just doing an offer of proof. The question was, did she, being [D.G.], ever acknowledge and tell you that she did lie and that she knew that that was a lie and your answer was yes. Correct?
>
> [Carter:] Correct.
>
> [Chavez:] All right. So does that refresh your recollection that [D.G.] told you that she knew she lied when she filed those protection order applications against you?
>
> [Carter:] Correct.

2 VRP at 522.

The trial court prohibited this additional testimony from Carter. Relying on the text of ER 608(b) and related Washington case law, the trial court concluded that Carter's testimony about the protection-order petition was the type of extrinsic evidence prohibited by the rule.

The trial court also noted that the prohibition of extrinsic evidence in ER 608(b) was not necessarily absolute because the defendant had a Sixth Amendment right to present a defense. But the trial court determined that because Chavez had already been afforded adequate avenues of

impeachment, the Sixth Amendment did not require an exception to the exclusion of the testimony under the evidence rules.

D. LAW ENFORCEMENT'S TESTIMONY

Law enforcement's testimony included their observations about D.G.'s demeanor during her disclosures to them. Deputy Greg Marek testified that D.G. was "[v]ery calm, but emotional" during her interview. 2 VRP at 536. He described D.G. as becoming choked up at times, looking away, and tapping the table. But Deputy Marek explained that as D.G. made her statements, she had enough confidence and composure to keep the emotions from overcoming her responses to his questions. A forensic interviewer similarly commented on D.G.'s body language. The interviewer observed D.G. wringing her hands and then briefly crying midway through the interview before regaining her composure.

During cross-examination, Deputy Marek testified that D.G. had reported approximately 60 incidents and had described digital penetration that caused bleeding.

Following testimony from the law enforcement witnesses, the State rested.

E. CHAVEZ TESTIMONY

Chavez testified in his own defense. He flatly denied D.G.'s allegations, characterizing them as "all lies." 2 VRP at 598. He claimed that he was never alone with D.G. and maintained that, between 2003 and 2007, his visits to his brother's (D.G.'s father's) residence were limited to working in the garage on Saturdays and did not involve entering the house. He further testified that he had never owned a red vehicle, that he was living with his sister in Vancouver in 2003, and that he spent more than fourteen months in Mexico during 2006-2007 to obtain his green card.

9

F.  BLANCAS' TESTIMONY

Chavez's wife, Maria Blancas, also testified and corroborated aspects of Chavez's testimony.  She explained that she met Chavez in 2004 and married him in 2005.  Blancas testified that Chavez could not have been a part of the incidents D.G. described for several reasons.  Blancas asserted that there were no sheds at D.G.'s home in 2010, despite D.G.'s testimony indicating otherwise.  Blancas also explained that Chavez worked across the street from their residence and that he walked to work because Chavez did not own a vehicle in 2004.  Blancas then testified that Chavez got his first vehicle in 2005 and that it was a baby blue pickup, not a red car.  Blancas further testified that Chavez finished work at approximately 3:30 p.m. and "always" returned home by about 4:00 p.m., with no regular evening absences once they were married.  2 VRP at 610.  Additionally, both Blancas' testimony and Chavez's passport established that Chavez was in Mexico from September 2006 to November 2007.

Following Blancas' testimony, Chavez rested.

G.  CLOSING ARGUMENTS

In its closing argument, the State contended that it had proved the essential elements for each count beyond a reasonable doubt.  The State acknowledged that there were some inconsistencies in D.G.'s account, but it argued that such inconsistencies are typical of trauma occurring during childhood.  And the State underscored that even if there were some inconsistencies for some counts, there was certainly "no inconsistency" and "no impeachment" relating to the incident at her aunt's house (Count 1).  2 VRP at 637.

In his closing, Chavez argued that not only was he "presumed innocent," he was "in fact, innocent."  2 VRP at 618.  He contended that the State offered "no true evidence."  2 VRP at 618.

According to Chavez, the State only presented a "non-corroborated, non-supported, and non-consistent claim" from D.G., whose testimony was "riddled with internal inconsistencies." 2 VRP at 618, 619. Chavez highlighted the contradictions about timing, frequency, and circumstances—such as claims of numerous incidents in front of a large window "yet, nobody noticed"; discrepancies about her brothers' whereabouts; inconsistent stories about the timing (the abuse first happening at nighttime but then shifting to daytime); and a report to her mother and law enforcement of vaginal penetration that caused bleeding, which conflicted with D.G.'s later testimony. 2 VRP at 620. Chavez identified these deviations as "shocking[ly]" inconsistent. 2 VRP at 621. He argued that he presented unrebutted testimony relating to the non-existence of the backyard shed and the red car, and that his work and travel left only a "very shallow period" for the alleged conduct to even take place. 2 VRP at 625. Chavez requested an acquittal.

## II. TRIAL COURT VERDICT AND WRITTEN FINDINGS

After reviewing all the testimony and other evidence, the trial court orally explained its decision. It identified the "key issue" as D.G.'s credibility and examined whether she had any motive to fabricate. 2 VRP at 634. The trial court acknowledged D.G.'s animus toward Chavez and noted the inconsistencies in D.G.'s accounts of the incidents. But the trial court determined that the animus stemmed from Chavez's prolonged sexual abuse and that the inconsistencies were not of "such merit that they undermined the credibility of [D.G.]" 2 VRP at 644.

After finding D.G. credible, the trial court determined that her testimony supported every element for all three counts. While the trial court acknowledged the scarcity of physical evidence, it identified other corroborating evidence that supported D.G.'s claims. The trial court found Chavez guilty beyond a reasonable doubt.

The trial court entered written findings that were consistent with its oral ruling. The written findings detailed the abuse pattern and the specifics of each incident and their context, including that Chavez was D.G.'s paternal uncle, that he was more than 36 months older than her, and that all the incidents occurred in Washington.

The trial court's findings also identified the evidence that corroborated D.G.'s claims and the trial court's assessment of her credibility. The findings referenced the marked change in D.G.'s behavior between the ages of eight and twelve, issues with adult intimacy as she got older, and the emotional distress she experienced as a result of the abuse as evidenced by her demeanor with law enforcement during forensic interviews.

One of the findings, finding of fact 12, referenced Valentina's testimony about her observations of Chavez with D.G. Despite Valentina's testimony that she did not observe anything sexual between the two of them, the finding stated, "[D.G.]'s mother Valentina observed [Chavez] giving [D.G.] inappropriate looks, looking at her *with sexual interest*." CP at 222 (emphasis added).

Based on its findings, the trial court to conclude that Chavez touched D.G.'s sexual or intimate parts for his own sexual gratification and that Chavez was guilty beyond a reasonable doubt of three counts of first degree child molestation.[5]

Chavez appeals.

---

[5] The trial court also found beyond a reasonable doubt that Chavez used his position of trust or confidence to facilitate each offense against D.G.

ANALYSIS

Chavez challenges his convictions with two arguments. First, Chavez asserts that the trial court violated his Sixth Amendment right to present a defense when it excluded evidence that D.G. may have fabricated allegations against Carter in a protection-order petition. Second, Chavez contends that insufficient evidence supports his convictions because the trial court relied on an erroneous finding (finding of fact 12) to reach its conclusion. We affirm.

I. SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants " 'the right to a fair opportunity to defend against the State's accusations.' " *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)); U.S. Const. amend. VI; Const. art. I, § 22. However, a criminal defendant's right to present a defense is not absolute. *Id.* Judges have the discretion to " 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022) (alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

We use a two-step process to analyze whether a defendant's right to present a defense has been violated by a trial court's evidentiary ruling. *Id.* at 58. First, we review "the trial court's evidentiary rulings for abuse of discretion." *Id.* Second, if there was no evidentiary error or if the error was deemed harmless, we review whether the exclusion of evidence nevertheless violated the defendant's constitutional right to present a defense de novo. *Id.*

Chavez's argument does not involve step one.  Chavez does not argue that the trial court abused its discretion by ruling that Carter's testimony was inadmissible under ER 608, nor do we see any error.  Under ER 608(b), extrinsic evidence of prior instances of conduct is not admissible to prove a witness's character.  Carter's statements in Chavez's offer-of-proof—that D.G. had previously made false accusations in an unrelated petition for a protection order—constituted extrinsic evidence to attack D.G.'s character for truthfulness.  This is generally inadmissible under ER 608(b).  *See State v. Lile*, 188 Wn.2d 766, 783, 398 P.3d 1052, 1061 (2017).  Thus, the trial court did not abuse its discretion by excluding Carter's testimony under ER 608(b).

Chavez's argument is rooted in step two of the Sixth Amendment analysis; that is, notwithstanding that the evidence rules excluded Carter's testimony, Chavez contends his constitutional right to present a defense still required the admission of the testimony.

For the second step, we employ the "*Hudlow* balancing test,"[6] which weighs the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence.  *Jennings*, 199 Wn.2d at 63.  In employing this test, we look at whether the evidence was of such " 'extremely high probative value' " that it was the defendant's *entire* defense, or whether the defendant was still able to advance their defense theory at trial without it.  *State v. Arndt*, 194 Wn.2d 784, 813-14, 453 P.3d 696 (2019) (quoting *Jones*, 168 Wn.2d at 721).  Such evidence cannot generally be excluded without violating the right to present a defense.  *Jennings*, 199 Wn.2d at 65.

---

[6] *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983).

But evidence that "merely bolsters credibility" should not be confused with evidence that is "*necessary* to present a defense." *Jennings*, 199 Wn.2d at 66-67 (emphasis added). Further, because the evidentiary rules already govern what can be properly presented at trial, when no evidentiary error has occurred, "[t]he balance more often tips against a constitutional violation . . . ." *State v. Caril*, 23 Wn. App. 2d 416, 431, 515 P.3d 1036 (2022), *review denied*, 200 Wn.2d 1025, *cert. denied*, 144 S. Ct. 125 (2023).

Here, Chavez argues that his need for the excluded evidence significantly outweighed its potential prejudice and the State's "minimal interest" in its exclusion. Reply Br. at 16. Chavez argues that the excluded evidence was particularly relevant because it demonstrated D.G.'s lack of credibility under oath and her motivation for giving false testimony to gain power in her relationships. This, he contends, is different than D.G. merely being inconsistent. Chavez also argues that the State "has a minimal interest in shielding people from accountability for making false statements under oath . . . ." Reply Br. at 16.

We are unpersuaded for several reasons. First, Chavez's main defense theory was that D.G. was not credible. Even without the excluded testimony, he was able to present many other examples of her inconsistency. *See Arndt*, 194 Wn.2d at 812-13. For example, through cross-examination of several witnesses, Chavez was able to show that D.G. made inconsistent statements about whether Chavez had ever penetrated her and whether she had bled as a result. Chavez also offered evidence that, despite D.G.'s testimony to the contrary, he never owned a red car, and he was never alone with D.G. at his brother's (D.G.'s father's) house. Chavez also offered evidence that during the time D.G. said the abuse occurred, he was out of the country for over a year and there was no shed in D.G.'s parents' backyard.

15

Second, the excluded evidence was related to issues entirely unrelated to D.G.'s accusations against Chavez. Even if false statements under oath can be generally characterized as being more egregious than inconsistent statements not made under oath, the excluded evidence pertained to a wholly different context. Statements made in a protection-order petition within a strained marriage share few similarities to allegations of years-long sexual abuse of a child. *See Lee*, 188 Wn.2d at 489 (a witness' prior false statement is not always relevant, particularly when that evidence is unrelated to the present case). Given the dissimilarities between the two contexts, Chavez's argument that the excluded evidence shows D.G.'s overall, generalized motive to lie under oath to "gain power" over Chavez is weak. Reply Br.at 13; *see also Arndt*, 194 Wn.2d at 812-13.

Finally, the State's interest in the exclusion of this evidence is greater than Chavez suggests. Ensuring that the trial focused on the child abuse allegations and inquiries into the credibility of the witnesses relevant to those allegations, while avoiding having the trial dragged into tangential contentions unrelated to the charges, is a legitimate interest of the State.

In sum, Chavez was still able to present a robust defense rooted in the inconsistencies of D.G.'s allegations. While this extrinsic evidence may have "bolstered" his defense theory, it was not "necessary" for him to present a defense. *See Jennings*,199 Wn.2d at 66-67. On balance, Chavez has not demonstrated his need was so great or the probative value so high as to overcome its proper exclusion under the evidence rules. *See Caril*, 23 Wn. App. 2d at 431 (when there is no evidentiary error, "[t]he balance more often tips against a constitutional violation . . . ."). Chavez's Sixth Amendment argument fails.

II. SUFFICIENCY OF THE EVIDENCE

Chavez next argues that insufficient evidence supports his convictions. Chavez's argument relies on finding of fact 12 in the trial court's written findings regarding what Valentina observed. Chavez contends that this finding was unsupported by Valentina's testimony. Finding of fact 12 states: "[D.G.]'s mother Valentina observed [Chavez] giving [D.G.] inappropriate looks, *looking at her with sexual interest*." CP at 222 (emphasis added). Chavez contends that there was no evidence supporting the finding that Valentina saw any looks "with sexual interest." Br. of Appellant at 30. Chavez argues that once this finding is rejected, the trial court's overall assessment of D.G.'s credibility essentially fails. The end result, according to Chavez, is insufficient evidence to support the verdict. We disagree.

A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). After properly construing the evidence, we determine whether any rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025).

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Our Supreme Court has recently held that our review for sufficiency of the evidence in a criminal case is the same regardless of whether the finder of fact was a jury or the trial court. *Roberts*, 5 Wn.3d at 247. *Roberts* rejected previous suggestions that following a bench trial, appellate courts limit their sufficiency review to the trial court's specific findings of fact and conclusions of law, as would be typical in a civil case. *Id.* at 234 (In criminal bench trials, "[a] [trial] court's findings and conclusions are not intended to limit appellate review[,]" but rather to "*facilitate* [it]." (emphasis in original)). *Roberts* confirmed that a sufficiency of the evidence challenge in a criminal case, even in a bench trial, requires reviewing courts to evaluate all the evidence before the trial court.

To prove first degree child molestation, the State must show that the defendant had sexual contact with someone under 12 years old and the defendant was at least three years older than the victim. *See* RCW 9A.44.083.

Credibility determinations are for the fact finder and are not subject to appellate review. *Roberts*, 5 Wn.3d at 235. We defer to the fact finder on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *Id.* at 234. In the course of considering all the evidence in a sufficiency challenge, credibility decisions are not questioned. *Id.*

By focusing on whether substantial evidence supports finding of fact 12, Chavez appears to be making his argument under a standard that *Roberts* rejected. But because *Roberts* instructs that our review of a claim of insufficient evidence for a criminal bench trial is essentially the same as it would be for a jury trial, we do not restrict ourselves to answering whether there is substantial evidence to support finding of fact 12; rather, we analyze the evidence as a whole.

Properly construed in favor of the State, there was sufficient evidence, considered as a whole, to support these convictions. D.G. testified that, on the relevant occasions, Chavez "dry humped" her and touched the intimate parts of her body for his own sexual gratification. D.G.'s credibility was supported by testimony showing her demeanor during the abuse and when reporting it. Valentina highlighted behavioral changes in D.G. during the time of the abuse, and Carter described D.G.'s discomfort with intimacy. And law enforcement officers noted D.G.'s emotional demeanor during her disclosures. Admitting the truth of this evidence and interpreting all reasonable inferences most strongly against Chavez, a reasonable fact finder could find each element of first degree child molestation beyond a reasonable doubt. Contrary inferences may be possible, but we defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *See Roberts*, 5 Wn.3d at 234.

CONCLUSION

Because Chavez's Sixth Amendment right to present a defense was not violated and because sufficient evidence supports his convictions, we affirm.[7]

---

[7] Chavez also argues that the cumulative error doctrine warrants reversal of his convictions. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. State v. Clark, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Here, because Chavez has failed to establish any error in his trial, the cumulative error doctrine does not apply.

No. 59834-5-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, A.C.J.

We concur:

LEE, J.

CHE, J.